[No. B009701. Second Dist., Div. Two. Mar. 5, 1987.]

PHOENIX INSURANCE COMPANY, Plaintiff and Respondent, v. UNITED STATES FIRE INSURANCE COMPANY et al., Defendants and Appellants.

1512

1514

**COUNSEL**

Flahavan, Hudson & Francis, William John Rea, Jr., William F. Flahavan, Clausen, Harris & Campbell, Lon Harris, Marie D. Clause and Gregory P. Orland for Defendants and Appellants.

Michel & Cerny, Allen L. Michel, Rosenfeld, Meyer & Susman and Walter S. Weiss for Plaintiffs and Respondents.

OPINION

COMPTON, J.–██ ██ ██ Defendants United States Fire Insurance Company (USFIC) and California Insurance Guarantee Association (CIGA)[1] appeal from a judgment entered in a declaratory relief action requiring them to pay plaintiff Phoenix Insurance Company (Phoenix) $500,000 and $360,000 respectively for sums expended by plaintiff to settle a legal malpractice lawsuit. We affirm.

The events leading to the underlying malpractice action are not disputed by the parties.[2] In October 1967, Margaret Jones (client) engaged the law firm of Raskin and Lichtig to represent her in a dissolution proceeding. At the outset, she informed the attorneys that her husband had threatened to loot their considerable community estate.

In February 1968, the attorneys filed a complaint to dissolve the marriage. As usual, the parties entered into certain stipulations and the trial court issued various restraining orders. In March 1971, after the completion of trial, the court took the matter under submission. Then, in mid-1971, when the court was near to rendering its decision, husband, unimpeded by the restraining orders, sold or secreted much of the community assets.

On June 29, 1971, the court appointed a receiver to gather and manage the remaining property. During the next three years, the receiver succeeded in recovering some funds belonging to the community. In September of 1974, at the behest of Raskin and Lichtig, the receiver paid the attorneys in excess of $100,000 for legal fees. Following that payment, the remainder of the community estate was totally inadequate to satisfy client's judgment.

Client subsequently hired new counsel and in June 1975 commenced a malpractice action against her former attorneys who, however, did not officially substitute out of the divorce action until sometime in late 1976.

The complaint alleged, inter alia, that Raskin and Lichtig negligently failed to secure the community property before, during, and after trial; inadequately attempted to regain recoverable assets; and unfairly allocated to

---

[1] "[The California Insurance Guarantee Association was created by legislation] in 1969 as a compulsory association requiring most state-regulated insurance companies to be members. ([Ins. Code] §§ 1063-1063.14; 1063, subd. (a).) [¶] 'Its purpose is to provide insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies.' [Citations.] [¶] The legislative intent was to create a protection for the public against insolvent insurers when no secondary insurer is available." (*Central National Ins. Co.* v. *California Ins. Guarantee Assn.* (1985) 165 Cal.App.3d 453, 458 [211 Cal.Rptr. 435]; footnote omitted.)

[2] All statutory references are to the Insurance Code.

themselves community funds which had been recouped. The complaint prayed for damages for monetary loss and for emotional distress.

During various periods of their employment with client, Raskin and Lichtig carried malpractice insurance with Phoenix, USFIC, Olympic Insurance Company (Olympic), Central National Insurance Company of Omaha (Central), and Signal Insurance Company (Signal).

In the beginning stages, the defense of the malpractice action was undertaken by a consortium of insurers composed of Olympic, Central, and Signal. Phoenix did not initially participate in the defense believing that its role was only as an excess insurer.

At this juncture, a brief review of the policies and their coverage is required. From June 10, 1967 through June 10, 1973, Raskin and Lichtig purchased annual insurance policies in the amount of $300,000 per claim or occurrence with an aggregate sum of protection in the amount of $900,000. As discussed in more detail, *infra,* starting with Olympic, then Central and Signal, each carrier wrote two consecutive annual policies for the attorneys. Between June 10, 1973 and June 10, 1974, Signal insured the attorneys in the amount of $300,000 per claim or occurrence with aggregate liability in the sum of $900,000. In April 1974 that coverage was increased to $1 million per occurrence, $3 million aggregate. From June 10, 1974 through June 10, 1978, Phoenix insured the law firm as a primary carrier for the same amount of coverage. As to claims made for acts occurring prior to the inception of its policy and which potential claims were unknown to the insured, Phoenix provided coverage in excess of what policy coverage was in place at the time of the acts.[3]

USFIC provided Raskin and Lichtig excess coverage in the amount of $1 million for the period between February 4, 1969 and February 4, 1978.

In January 1978, some two and one-half years after the filing of the malpractice action, the California Insurance Commissioner declared Signal

[3]Under the heading of Insuring Agreements, paragraph five of Phoenix's policy stated in relevant part: "This policy applies only to acts or omissions committed anywhere in the world (a) during the policy period, and/or (b) prior to the policy period if claim is made or suit is brought against the insured during the policy period and such insured at the effective date of the insurance did not know or could not have reasonably foreseen that such acts of omissions might be expected to be the basis of a claim or suit, provided that with respect to (a) and (b) foregoing the original suit for damages is brought within the United States of America...."

Under the heading of Conditions, paragraph seven of Phoenix's policy stated in relevant part: "[W]ith respect to acts or omissions which occur prior to the policy period, the insurance hereunder shall apply only as excess insurance over any other valid and collectible insurance and shall then apply only in the amount by which the applicable limit of liability of this policy exceeds the sum of the applicable limits of liability of all such other insurance."

insolvent and obtained a court order placing the company's assets in possession of a court-appointed liquidator. By operation of law (see § 1063 et seq.), CIGA was substituted in place of Signal presumptively to fulfill Signal's obligation to its insureds.

On May 15, 1978, however, CIGA notified Raskin and Lichtig that under the provisions of the Insurance Code it had no legal obligation to defend or insure them since coverage was available under the Phoenix policy. It was CIGA's contention that Phoenix's excess policy provision covered any alleged malpractice which occurred between June 10, 1971 and June 10, 1974.[4] The letter from CIGA concluded: "The California Insurance Guarantee Association believes the primary responsibility of this file now rests with the Phoenix Insurance Company and it is at this time instructing [the attorneys representing Raskin and Lichtig] that the C.I.G.A. is immediately withdrawing from the defense of this case."[5] Sometime thereafter, CIGA tendered defense of the case to Phoenix on the ground that the latter's excess policy constituted "other insurance" under the Insurance Code.

On July 10, 1978, Phoenix wrote to Raskin and Lichtig informing them that it was the carrier's position that Signal and/or CIGA was liable to the attorneys for coverage from 1971 through 1974. By virtue of the liquidation order, however, all persons were enjoined from bringing any legal action against Signal; hence, according to Phoenix, it was barred from instituting a declaratory relief action to determine the respective parties' rights and obligations. Accordingly, Phoenix informed Raskin and Lichtig that it would defend the attorneys under a reservation of rights. Included with the letter was a claim for submission to the California Department of Insurance.[6] Raskin and Lichtig then lodged their claim, but it was thereafter rejected.

Subsequently, Phoenix and CIGA voluntarily submitted to binding arbi-

---

[4]CIGA is statutorily obligated to pay only "covered claims." Section 1063.1, subdivision (c)(7) in relevant part provides: " 'Covered claims' shall not include (a) any claim to the extent it is covered by any other insurance of a class covered by the provisions of this article available to the claimant. . . ."

[5]In response to a letter from Raskin and Lichtig's defense attorneys, CIGA again wrote on May 29, 1978: "The California Insurance Guarantee Association will remain firm in its decision to withdraw from the defense of this case."

[6]Section 1021, subdivision (a) provides: "Upon the making of an order to liquidate the business of such person, the commissioner shall cause to be published notice to its policyholders, creditors, shareholders, and all other persons interested in its assets. Such notice shall require claimants to file their claims with the commissioner, together with proper proofs thereof, within six months after the date of first publication of such notice, in the manner specified in this article."

Section 1024 reads in pertinent part: "Unless such claim is filed in the manner and within the time provided in section 1021, it shall not be entitled to filing or allowance, and no action may be maintained thereon. . . ."

tration the issue of whether the presence of Phoenix as an excess carrier absolved CIGA of any obligation to provide coverage for Raskin and Lichtig. On October 25, 1978, the arbitrator decided in CIGA's favor, ruling that Phoenix, by virtue of its excess insurance provision, had the primary duty to defend and indemnify Raskin and Lichtig for any negligent acts or omission committed by them during Signal's policy period. The arbitrator did not determine whether the insured should have known of the potential claim at the time Phoenix undertook coverage. That issue was left for determination in another proceeding.

On December 26, 1978, Phoenix filed an action for declaratory relief naming as defendants Raskin and Lichtig, Olympic, Central, USFIC and CIGA.[7] In an attempt to expedite resolution of the various claims, the declaratory relief and the malpractice actions were consolidated.

Believing they faced great exposure under their policies, the carriers requested the court to stay proceedings in order to allow them to settle the malpractice litigation for $1.8 million. Although urged by the trial court to participate in the settlement proceedings, CIGA declined to do so.

The settlement agreement which was eventually executed explicitly noted that it was not binding on CIGA. The agreement further recited that Raskin and Lichtig had not conceded liability for malpractice. The carriers, unable to agree among themselves as to the percentage of the settlement for which each was responsible, agreed to submit the issue of apportionment to a special referee.

After examining the evidence before him, the referee, on July 6, 1979, formulated a payment schedule requiring the carriers to pay the following amounts: Olympic $80,000, Central $400,000, Phoenix $950,000, and USFIC $370,000.

By July 11, 1979, Phoenix and USFIC, while reserving their right to later relitigate the apportionment, paid the aforementioned amounts to satisfy their respective obligations. Olympic and Central, on the other hand, stipulated they would pay their portion of the settlement without a challenge in exchange for Phoenix's agreeing to dismiss them from the declaratory relief action.

---

[7]Section 1063, subdivision (g) provides: "[CIGA], either in its own name or through servicing facilities, may be sued and may use the courts to assert or defend any rights the association may have by virtue of this article as reasonably necessary to fully effectuate the provisions thereof."

On February 5, 1980, CIGA and USFIC stipulated that Phoenix could amend its complaint to allege: "Prior to the trial of the Jones Action and in March 1979, Raskin/Lichtig entered into a settlement agreement with Mrs. Jones, the terms of which are confidential. To assist settlement, plaintiff advanced funds in an amount greatly exceeding the amount for which it was liable under its policy. CIGA refused to advance any funds towards settlement although it was and is obligated under the law to pay on behalf of Raskin/Lichtig a substantial portion of Mrs. Jones' claim. The amount advanced by [USFIC] is far less than [USFIC] is obligated to pay on behalf of Raskin/Lichtig for Mrs. Jones' claim."

On April 24, 1980, USFIC filed a cross-complaint seeking reimbursement from Phoenix for money advanced in settling the malpractice action under the theory that Phoenix, vis-á-vis USFIC, was the primary carrier during the time the alleged malpractice occurred.

The trial court denied CIGA's demand that the lawsuit be tried in whole before a jury and bifurcated the litigation.[8] The jury was presented with the single issue of whether the attorneys knew or should have known of the malpractice claim when they purchased coverage from Phoenix. In response to a special interrogatory, the jury found in the affirmative.

In the second part of the proceedings, three issues were presented to the court: (1) Did the attorneys commit acts covered under the policies and were damages suffered therefrom?; (2) Did Phoenix waive its right to assert the defense that the attorneys were not its insureds under its policy provision?; and (3) Could the referee's apportionment be modified?

During this stage of the action, CIGA renewed its demand for a jury trial to determine whether Raskin and Lichtig committed malpractice during their policy period and to ascertain the amount of client's damages. The trial court, however, ruled that the issue of malpractice and damages had been determined by the settlement and that no further evidence on those issues was required.[9] The court also found that CIGA was bound by the agreement even though it did not participate in the malpractice defense. Thereupon, Phoenix introduced documentary evidence which included the superior

---

[8]Although on appeal USFIC claims it was entitled to an unbifurcated jury trial on all issues, the record reveals that the carrier, after the completion of the first phase of the lawsuit, explicitly waived its right to a jury trial on the remaining issues.

[9]In making its ruling, the trial court stated: "I don't think anyone can consider the fact that a settlement was made for $1.8 million under the threat of [malpractice] litigation, . . . you just cannot ignore the fact no one in their right mind pays $1,800,000 unless Raskin and Lichtig have been guilty of very serious malpractice. I mean, everything in common sense indicates that the defendants and their carriers were very fearful of a judgment in favor of Mrs. Jones a great deal in excess of 1.8 million."

court files of client's divorce and malpractice actions. USFIC then presented the only testimony heard by the court. It was given by an expert witness who opined that Phoenix had lost its right to seek equitable contribution from USFIC because Phoenix had mishandled the malpractice claim. The only defense offered by CIGA was that it was statutorily prohibited from compensating another insurer by way of subrogation.

After a consideration of the evidence, the court divided the representation of client by Raskin and Lichtig into three periods: (1) February 4, 1969 through June 10, 1971, the years that Olympic first and then Central were the primary carriers; (2) June 10, 1971 to June 1974, the term that Signal provided primary coverage; and (3) June 10, 1974 through June 10, 1977, the period that Phoenix was the primary insurer. At all relevant times, USFIC provided excess insurance.

Next, the court quantified the alleged malpractice by assigning percentages to the time periods as follows: February 4, 1969, to June 10, 1971 (75 percent), June 10, 1971 to June 10, 1974 (20 percent), and June 10, 1974, to June 10, 1977 (5 percent). Translated into dollar amounts, the individual insurer were liable as follows: Olympic $80,000, Central $400,000, USFIC, based upon its excess coverage from February 4, 1969, to June 10, 1971, $870,000, Signal (CIGA) $360,000, and Phoenix, based on its primary coverage provision in force from June 10, 1974, to June 10, 1977, $90,000. The court then entered judgment ordering that USFIC pay $500,000 and CIGA $360,000 to Phoenix for money advanced to satisfy the malpractice settlement.

The additional contribution by USFIC was ordered because the $480,000 paid by Olympic and Central was inadequate to cover the period between February 4, 1969 to June 10, 1971. The trial court held that the shortfall was to be made up from USFIC's excess coverage since Olympic and Central had been dismissed with prejudice from the declaratory relief action. The court further ordered that USFIC take nothing on its cross-complaint.

On appeal, USFIC contends (1) the trial court should have found that Phoenix had waived its coverage defense; (2) that it was entitled to an unbifurcated jury trial; (3) that the trial court made certain improper rulings; and (4) that the judgment is not supported by the evidence.

For its part, CIGA argues that under section 1063.1, insurance companies are precluded from recovering against it by way of subrogation or contribution. It also asserts that under Signal's policy no liability could arise without a judgment of malpractice or the company's consent to a negotiated

settlement.[10] Finally, CIGA contends that it was entitled to a jury trial on the issue of whether the conduct of Raskin and Lichtig in the underlying lawsuit constituted legal malpractice.

We begin our analysis by first addressing the contentions advanced by CIGA. Pursuant to its enabling legislation, CIGA is mandated to honor only "covered claims." Such claims are generally defined by statute to be the unpaid obligations of an insolvent insurer which are imposed by law and arise out of an insurance policy written by the carrier. (See § 1063.1, subd. (c)(1).) Many categories of claims, however, are statutorily excluded from the ambit of "covered claims," including those claims made by right of subrogation (§ 1063.1, subd. (c)(7)) and, except as otherwise provided by legislation, obligations to insurers, insurance pools, or underwriting associations. (§ 1063.1, subd. (c)(4).)

CIGA argues that it is insulated from liability in this case relying on, inter alia, *Interstate Fire & Casualty Ins. Co.* v. *California Ins. Guarantee Assn.* (1981) 125 Cal.App.3d 904 [178 Cal.Rptr. 673]. In that proceeding, Interstate sued CIGA for, among other things, breach of its duty to settle the lawsuit brought against the insured of CIGA's insolvent predecessor, Allstar. Pursuant to their respective policies, Interstate was the excess insurer while Allstar provided primary coverage. During the pendency of the underlying lawsuit, Allstar became insolvent and CIGA took over the insured's defense. CIGA allegedly had the opportunity to settle the action within the policy limits of Allstar when it purportedly in bad faith refused to do so. Following a trial, the third party claimant received a judgment in excess of Allstar's coverage. Interstate satisfied the excess portion of the judgment and then instituted an action against CIGA. The trial court dismissed the action. In affirming the dismissal, the Court of Appeal noted that while an excess insurer has a right to bring an action against a primary carrier for wrongful refusal to settle, that remedy is based on the subrogation of the insured's right to sue a primary carrier for a judgment in excess of its policy limits when the insurer wrongfully refused to settle. Interstate was thus statutorily barred from suing CIGA. (*Id.,* at pp. 910-911.)

---

[10]Signal's policy provided in relevant part: "No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company. [¶] Nothing contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the insured to determine the insured's liability."

Section 1063.2, subdivision (b) provides in pertinent part: "The association shall be a party in interest in all proceedings involving a covered claim, and shall have the same rights as the insolvent insurer would have had if not in liquidation...."

Citing *California Union Ins. Co. v. Central National Ins. Co* (1981) 117 Cal.App.3d 729, 734 [173 Cal.Rptr. 35] the *Interstate* court stated: " 'The Legislature chose to provide a limited form of protection for the public, not a fund for the protection of other insurance companies from the insolvencies of fellow members.' " (*Interstate Fire & Casualty Ins. Co. v. California Ins. Guarantee Assn., supra,* 125 Cal.App.3d at pp. 909-910.)

In contrast to the authorities relied upon by CIGA, however, we view Phoenix's right for relief as being based on the equitable principal of indemnification and, thus, *independent* of any duty owed by CIGA to Signal's insureds.

▇▇▇ While the Insurance Code provides generally that CIGA may be sued (§ 1063, subd. (g)), actions based on an obligation to an insurer or on a right of subrogation are excluded. (§ 1063.1 subds. (c)(4) and (c)(7)(b).) Nothing in the legislation, however, prohibits an insurer suing CIGA for a declaration of its rights vis-à-vis CIGA. "It is properly within the competent authority of a court to hear a declaratory judgment action relating to the rights and obligations of two insurance companies as to the coverage of their respective policies, where the pleadings embrace and present this ultimate and controlling issue."[11] (18 Couch on Insurance (2d Rev. ed. 1983) § 74:148, p. 659.)

▇▇▇▇▇ The judgment in the instant case declared that which the trial court was surely empowered to determine, i.e., whether "other insurance" was available to Raskin and Lichtig during Signal's policy period;[12] and if no such coverage existed, what was CIGA's share of liability.

▇▇▇ In the final analysis, Phoenix's lawsuit was based neither on an "obligation to an insurer" nor a "right of subrogation." It was based on a contention that CIGA wrongfully refused to perform its legal role and thereby wrongfully forced Phoenix to perform that role. Phoenix should not be punished for settling, in good faith, the malpractice claim instead of placing its own self interests before the interests of the injured client by first

---

[11]CIGA also cites as authority in its favor *Central National Ins. Co. v. California Ins. Guarantee Assn., supra,* 165 Cal.App.3d 453. There, the appellate court affirmed CIGA's dismissal from a declaratory relief action brought by Central, which was a coinsurer of the insolvent Signal. CIGA refused to participate in the defense or settlement of various underlying lawsuits taken against Signal's insureds. Unlike the instant case, however, a determination had been made that "other insurance was available in the form of [Central]." (*Id.,* at p. 460.)

[12]We reject out of hand CIGA's contention that the Insurance Code permits it to abandon an insured anytime an argument can be made that "other insurance" is available. Such an interpretation runs contrary to the legislation's purpose, which is to give the insured of an insolvent carrier some sense of security in knowing that he or she has at least a minimal amount of insurance protection.

litigating a lengthy declaratory relief action. This is especially true in light of the decision in *Royal-Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 884 [153 Cal.Rptr. 842, 592 P.2d 329], wherein the Supreme Court found that under section 790.03, subdivision (h)(5) a third-party claimant could bring an action against an insurer which did not attempt "in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." (§ 790.03, subd. (h)(5).)

■ It is clear that Phoenix, having established that Raskin and Lichtig were not its insureds during the period in question, was entitled to be indemnified for the loss it incurred as a result of CIGA's refusal to participate in the litigation. The purpose and objective of creating CIGA was to spread throughout the industry a loss suffered by an insured as the result of the insolvency of an insurer.[13] It would be inconsistent with that purpose and objective to permit CIGA, arbitrarily, to impose such a loss on a single insurer by simply refusing to participate in reasonable good faith efforts to settle with an insured.

Further, it would be patently unfair to allow CIGA to evade its statutory mandate while simultaneously permitting it to use the same statutes as a shield against an action such as the one here thereby saddling an innocent carrier with the entire loss resulting from Signal's insolvency. (See *Biggs* v. *California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 647 [179 Cal.Rptr. 16].) This would serve to give CIGA unfettered discretion in determining the extent of its participation in any given case and make it ultimately unaccountable to the judiciary—a result clearly not intended by the Legislature. (See § 1063, subd. (g).)[14]

CIGA contends, of course, that subrogation and indemnity are synonymous and that Phoenix is therefore barred from recovering any amounts paid in settlement of the client's claim.

■ That there is a distinction between subrogation and indemnification needs little discussion. Subrogation is "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to

---

[13]Section 1063.5 provides in relevant part: "Each time an insurer becomes insolvent then, to the extent necessary to secure funds for the association for payment of covered claims of that insolvent insurer and also for payment of reasonable costs of adjusting the claims, the association shall collect premium payments from its member insurers sufficient to discharge its obligations...."

[14]The importance of this concept is underscored in the instant case where the insolvent's insureds (i.e., Raskin and Lichtig) refused to bring their own action against CIGA to compel it to defend them.

the debt or claim, and its rights, remedies, or securities. [Citations.]" (Black's Law Dictionary (5th ed. 1979) p. 1279; see also 14 Cal.Jur.3d, Contribution and Indemnification, § 23.)

Indemnity, however, has been defined as the obligation resting on one party to make good a loss or damage which another party has incurred. (*Rossmoor Sanitation, Inc.* v. *Pylon, Inc.* (1975) 13 Cal.3d 622, 628 [119 Cal.Rptr. 449, 532 P.2d 97].) The obligation may arise from either of two general sources: "First, it may arise by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances. Second, it may find its source in equitable considerations brought into play either by contractual language not specifically dealing with indemnification or *by the equities of the particular case.* [Citations.]" (*E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 506-507 [146 Cal.Rptr. 614, 579 P.2d 505], italics added; *Rossmoor Sanitation, Inc.* v. *Pylon, Inc., supra,* 13 Cal.3d at p. 628.)

As we stated in *Aetna Life & Cas. Co.* v. *Ford Motor Co.* (1975) 50 Cal.App.3d 49, 52-53 [122 Cal.Rptr. 852]: "[Equitable indemnification] applies in cases in which one party pays a debt for which another is primarily liable and which in equity and good conscience should have been paid by the latter party. [¶] Equitable indemnity . . . is not available to a volunteer. It extends to those who pay in performance of a legal duty in order to protect their own rights or interests. [Citation.] However, one acting in good faith in making payment under a reasonable belief that it is necessary to his protection is entitled to indemnity . . . even though it develops that he in fact had no interest to protect. [Citation.]"

Where there is no trial and no judgment establishing liability, the settlement by the indemnitee becomes presumptive evidence of the liability and the amount thereof, which presumption is subject to being overcome by proof. (*Kershaw* v. *Maryland Casualty Co.* (1959) 172 Cal.App.2d 248, 258-259 [342 P.2d 72].) In an implied indemnity action, where defense of an action brought by the injured third party is tendered to the indemnitor and he refuses to defend, a good faith settlement by the indemnitee after such refusal is sufficient to establish that the damages were paid as a result of a legal obligation. (*People* ex rel. *Dept. Pub. Wks.* v. *Daly City Scavenger Co.* (1971) 19 Cal.App.3d 277, 282 [96 Cal.Rptr. 669].) The rule has also been stated as follows: "[W]here the indemnitee notifies the indemnitor of a pending claim and 'the indemnitor denies liability . . . and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage. (Citations.) A contrary rule would make the right to settle meaning-

less in cases where the indemnitor has denied liability.' [Citation.]" (*Pac. Tel. & Tel. Co.* v. *Pac. Gas & Elec. Co.* (1959) 170 Cal.App.2d 387, 392 [338 P.2d 984]; see also *Mabie & Mintz* v. *B & E Installers* (1972) 25 Cal.App.3d 491, 496 [101 Cal.Rptr. 919].)

■ Lastly, we consider CIGA's claim concerning its right to a jury trial. As previously noted, an indemnitor who wrongfully fails to participate in a lawsuit is conclusively presumed to be liable for the amount of the good faith settlement. Once the jury decided that the "claims made" provision of Phoenix's policy was unenforceable by Raskin and Lichtig, all other jury issues relating to CIGA became moot. In other words, CIGA was barred from raising any further defenses against indemnifying Phoenix for that portion of the settlement attributed to Signal's policy period.

■ We next address the issues raised in USFIC's appeal. USFIC first argues that between itself and Phoenix the latter is primarily liable for any excess indemnification left in the void because of the release of Central and Olympic from the declaratory relief action. The argument is based on evidence and expert opinion which, according to USFIC, establishes that Phoenix wrongfully failed to join in the malpractice defense during the initial stages of the litigation and that when Phoenix finally participated in the defense, it did so without a valid reservation of its policy rights. ■ **(See fn. 15)** In short, Phoenix waived its policy defenses[15] and became responsible for all excess indemnification, thus relieving USFIC from any liability.

■ While it is generally true that an excess carrier can sue a primary carrier for the failure of the primary to defend or settle (see *Commercial Union Assurance Companies* v. *Safeway Stores, Inc.* (1980) 26 Cal.3d 912,

---

[15]The duty to defend "results from the difficulty in determining whether the third party suit falls within the indemnification coverage before the suit is resolved. To solve this problem, the courts have imposed a duty to defend whenever the insurer ascertains facts which give rise to the possibility or 'potential' of liability to indemnify [citation]." (*Fresno Economy Import Used Cars, Inc.* v. *United States Fid. & Guar. Co.* (1977) 76 Cal.App.3d 272, 278 [142 Cal.Rptr. 681].) The penalty for a wrongful failure to defend is harsh. "If there is potential liability on the part of an insurer under a policy of insurance, there is a duty to defend, and the insurer is liable for all damages reasonably incurred by the insured in the event of a failure to defend. [Citation.]" (*Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257, 261 [107 Cal.Rptr. 175, 507 P.2d 1383, 90 A.L.R.3d 1185].)

Similarly, if an insurer does embark on a defense without first reserving its rights to dispute coverage, a carrier cannot later avoid indemnification by arguing that the third-party claim resided outside the provisions of the policy. (*Miller* v. *Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 755 [161 Cal.Rptr. 322].) One rationale given for the rule is: "The insurer's undertaking defense of the third party suit creates a high potential for *misleading* the insured, by creating the impression that the insurer is not disputing coverage. And, the insured may rely thereon by failing to retain independent counsel to negotiate or defend the action." (Cal. Practice Guide, Bad Faith (The Rutter Group 1986) Defense Under Reservation of Rights, § 8:166, p. 8-37, italics in original.)

917 [164 Cal.Rptr. 709, 610 P.2d 1038]), the evidence in the instant case does not support a finding that Phoenix acted improperly to the detriment of USFIC.

The record reveals that after receiving the malpractice complaint, Phoenix wrote to Raskin and Lichtig contending that the allegations in the complaint appeared to span a period of October 1967 through January 1974,[16] a period prior to Phoenix's policy period. Phoenix declared that it thus considered itself to be an excess carrier.

"Generally, an excess insurer has no duty to participate in the insured's defense or contribute to a settlement on its behalf until primary coverages are exhausted. [Citations.]" (*Nabisco, Inc.* v. *Transport Indemnity Co.* (1983) 143 Cal.App.3d 831, 836 [192 Cal.Rptr. 207].) In *Signal Companies, Inc.* v. *Harbor Ins. Co.* (1980) 27 Cal.3d 359 [165 Cal.Rptr. 799, 612 P.2d 889, 19 A.L.R.4th 75], our Supreme Court rejected the adoption of a rule which would require an excess carrier to participate in the defense of its insured as soon as it was notified of the claim, regardless of whether the primary coverage had first been exhausted. (*Id.*, at pp. 366-367.) The court stated: "[That such a rule] would be contrary to that line of cases which hold that where there is excess coverage, whether by virtue of an excess clause in one policy or otherwise, it is the primary insurer which is solely liable for the costs of defense if the judgment does not exceed primary coverage. [Citations.] These cases have held generally that even though the *claim* against the insured may be for a sum in excess of the primary coverage, the primary insurer is obligated to provide a defense and may not seek contribution from the excess carrier even though its successful settlement or defense relieves the excess insurer from indemnifying the injured party." (*Id.*, at p. 368; italics in original.)

There is simply no basis for a holding that Phoenix waived its policy defenses. Exhaustion of the primary coverage did not occur until *after* Phoenix tendered a defense and the parties entered into a settlement. In addition, without a duty to defend as an excess carrier in 1975 Phoenix had no obligation to notify its insureds of a reservation of rights. Our conclusion that, as a matter of law, there was no waiver, disposes of USFIC's claim that it was entitled to a jury trial on the issue. (See also fn. 8, *ante.*)

---

[16]Assuming arguendo, that Phoenix did breach its duty to contribute a pro rata share of the defense in 1975 because it initially knew of facts suggesting that the alleged malpractice extended into the years it was the primary insurer for Raskin and Lichtig, USFIC still would not have suffered any harm. USFIC was only ordered to contribute excess indemnification for the alleged malpractice committed before the inception date of Phoenix's coverage, i.e., the Olympic and Central policy periods.

 Next, USFIC contends that the trial court improperly accepted as a fact that Raskin and Lichtig committed legal malpractice and that the client suffered damages in the sum of $1.8 million. USFIC asserts that it cannot be required to contribute to Phoenix without Phoenix proving that malpractice occurred. In effect, USFIC contends that it was entitled to a "trial within a trial" because all the parties to the settlement stipulated in various writings that the settlement was not an admission by Raskin and Lichtig of malpractice. USFIC argues that given the opportunity it could have proved that there was no malpractice, hence, all the settling carriers were volunteers and that the original provisions of the settlement must remain in tact. We disagree.

As the referee's settlement order succinctly notes: "The parties to this proceeding determined prior to the settlement agreement that [client] *was certain to win* her lawsuit and was likely to obtain a large verdict." (Italics added.) For all intents and purposes, Phoenix and USFIC conceded between themselves that the insureds had committed malpractice. The fact that Raskin and Lichtig chose to maintain their innocence is of no moment.

 USFIC also asserts that the apportionment itself is not supported by the evidence. It argues that the trial court's allocation of malpractice over the various policy periods is arbitrary, speculative and founded on conjecture. It suggests that a more appropriate method of allocation would be based upon the relative size of the respective policy limits and the length of the policy periods. Again, we disagree.

Among the numerous documents entered into evidence by Phoenix, the most accurate historical records of the events in question were the superior court case files of the underlying divorce and malpractice actions. While the testimony of Raskin, Lichtig, and the client, of course, would have cast a clearer light on the representation provided by the attorneys, the trial court still had evidence of substantial weight and credibility upon which to allocate the indemnification between the carriers. Furthermore, the trial judge clearly had the expertise to study the evidence and apportion the settlement.

 USFIC's final contention is that the judgment has obligated USFIC beyond its contractual agreement since under its policies it could become liable for indemnification only after the insureds exhausted the coverage of their primary carriers, i.e., Olympic and Central. The argument is premised on the fact that the attorneys had combined primary coverage between 1967 and 1971 in the sum of $1.8 million which was not fully expended.

In effect, the primary coverage was "exhausted" when Central and Olympic paid their share of the settlement and were dismissed from the declaratory relief action. Had USFIC wanted to raise this issue, it could

simply have named Olympic and Central as defendants in its cross-complaint thereby assuring that all the parties were before the court when the reapportionment was determined.

The judgment is affirmed.

Roth, P. J., and Gates, J., concurred.

Petitions for a rehearing were denied March 31, 1987, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied June 17, 1987.