[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT
Plaintiffs, Veterans Memorial Medical Center, formerly known as Meriden-Wallingford Hospital ("VMMC"), and Pacific Employer's Insurance Company ("PEIC") have brought this claim for a declaratory judgment, pursuant to General Statutes § 52-29
and Connecticut Practice Book § 388, et seq., against the Connecticut Insurance Guaranty Association ("CIGA") to resolve a controversy regarding CIGA's statutory obligation following the insolvency of an insurer of VMMC, Ideal Mutual Insurance Company ("Ideal") and the settlement of a malpractice claim against VMMC. A declaratory judgment action is an appropriate method of determining insurance coverage. See, Safeco Insurance Co. v.Vetre, 174 Conn. 329 (1978).
The plaintiffs claim that CIGA is obligated to indemnify VMMC CT Page 8002 and PEIC in the of $300,000, less the $100 statutorily prescribed deductible. The parties appear to agree that $299,900 is the amount in controversy, although they disagree over whether CIGA is obligated to pay it. They also agree that resolution of this issue presents a question of law, and that this question is appropriate for disposition on summary. The plaintiffs, jointly, and the defendant have therefore each moved for summary judgment.
Summary judgment must be granted if the pleadings, affidavits, and other documentary proof show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law. Conn. Practice Book § 384; Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105,639 A.2d 507 (1994); Telesco v. Telesco, 187 Conn. 715,447 A.2d 752 (1982); Yanow v. Teal Industries, Inc., 178 Conn. 262,422 A.2d 311 (1979). A "material" fact is one which will make a difference in the outcome of the case. Hammer v. Lumberman'sMutual Casualty Co., 214 Conn. 573, 578, 573 A.2d 699 (1990). In ruling upon a summary judgment motion, the court determines whether an issue of fact exists, but does not try the issue if it does exist. Michaud v. Gurney, 168 Conn. 431, 362 A.2d 857
(1975).
The purpose of summary judgment is to eliminate the delay and expense accompanying a trial where there is no real issue to be tried. Dowling v. Kielak, 160 Conn. 14, 273 A.2d 716 (1970);Dorazio v. M.B. Foster Electronic Co., 157 Conn. 226, 253 A.2d 22
(1968). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." Connecticut Bank Trust Co. v. Carriage LaneAssociates, 219 Conn. 772, 780-81, 595 A.2d 334 (1980).
The following facts are undisputed and form the basis of the legal claims of both the plaintiffs and the defendant:
VMMC is and at all relevant times was a resident of Connecticut as defined by General Statutes § 38a-838(11) with its principal place of business in Meriden. CIGA is a non-profit, unincorporated legal entity created by the Connecticut General Assembly in 1971. General Statutes § 38a-836, et seq. By law it is to stand in the shoes of a member insurer who becomes insolvent, and it is bound to perform those duties and obligations which the member insurer would have had if it had not become insolvent, subject to certain limitations. Pursuant to General Statutes § 38a-837 and General Statutes § CT Page 800338a-838(8), the membership of CIGA at all relevant times consisted of all insurance companies licensed to transact business in Connecticut and which write any kind of direct insurance except those companies which write only life, title, surety, accident, health, credit, mortgage guaranty or ocean marine insurance.
Pursuant to General Statutes § 38a-838, [`]Claimant['] means any person filing a first party or liability claim against the association [CIGA], provided no person who is an affiliate of the insolvent insurer may be a claimant". "Covered Claim" means "an unpaid claim . . . which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971 and (a) the claimant or insured is a resident of this state at the time of the insured event. . . ."
Ideal issued a Comprehensive Hospital Liability Insurance policy to VMMC covering the period from October 1, 1983 through October 1, 1984 and was a member insurer of CIGA during the policy period. The limits of this policy were $500,000 per claim with a $1,000,000 aggregate. VMMC had fully paid all its premiums and reasonably expected both that Ideal would indemnify it for sums up to and including $500,000 per covered claim until an aggregate of $1,000,000 had been reached and that Ideal would incur the costs of defending against any covered claim for an occurrence within the policy period.
VMMC had also purchased an Excess Blanket Catastrophe Liability policy from PEIC covering the same policy period and with liability limits of $10,000,000 per occurrence. According to the terms of this policy, PEIC's obligation to indemnify VMMC began after the policy limits of VMMC's policy with Ideal had been exhausted. Specifically, the PEIC policy included the following significant provisions:
 "PEIC will indemnify the Insured for Ultimate Net Loss in Excess of the Retained Limits Hereinafter Stated Which the Insured Shall Become Legally Obligated to Pay As Damages Because of:
A. Personal Injury, or
B. Property Damage, or CT Page 8004
C. Advertising Injury
to which this insurance applies, caused by an occurrence, and
 (1.) With respect to any personal injury, property damage, property damage, or advertising injury not within the terms of the coverage of underlying insurance but within the terms of coverage of this insurance; or
 (2.) If limits of liability of the underlying insurance are exhausted because of personal injury, property damage or advertising injury, during the period of this policy, PEIC will have the right and duty to defend any suit against the insured seeking damages on account of such personal injury, property damages or advertising injury; even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . .
The section of the PEIC policy entitled "Retained Limit — PEIC's Limit of Liability" contains the following language:
 Regardless of the number of (1) Insureds under this policy, (2) persons or organizations who sustain injury or damage, or (3) claims made or suits brought because of personal injury, property damage, or advertising injury, PEIC's liability is limited as follows:
 With respect to personal injury, property damage or advertising injury, or any combination thereof, PEIC's liability shall be only for the ultimate net loss in excess of the Insured's retained limit defined as the greater of:
 (a) an amount equal to the limits of liability indicated beside the underlying insurance listed in Schedule A hereof [$500,000], plus the applicable limits of any other underlying insurance collectible by the Insured; or
 (b) the amount specified in Item 3. of the Limits of Liability section of the declarations because of personal injury, property damage or advertising injury not within the terms of the coverage of the underlying insurance listed in Schedule A: and then for an amount not exceeding the amount specified in Item 1. of the Limits of Liability section of CT Page 8005 the declarations arising out of any one occurrence.
In 1986, James E. Smith, Jr. brought a medical malpractice action against VMMC and Robert Biondino, M.D. arising out of medical treatment Smith received on and after April 8, 1984. Before the claim could be resolved, Ideal was determined to be insolvent. Because Ideal was insolvent, and the PEIC policy did not require it to indemnify VMMC until $500,000 had been paid, VMMC had no available insurance to cover the first $500,000 of any payments to be made on Smith's claim. It was not a named insured under Dr. Biondino's Medical Malpractice policy. After being notified of Ideal's insolvency and Smith's pending claim, however, CIGA took the position that it was not bound to indemnify VMMC[1] and that PEIC's coverage was required to "drop down" to replace the policy of the insolvent Ideal.
Without prejudice to their rights to pursue an independent legal action against CIGA, PEIC and VMMC paid the combined sum of $350,000 in order to effectuate a good faith settlement of Smith's claim, and a separate and significantly larger settlement was effected between Smith and Biondino. This declaratory judgment action followed.
"The Connecticut Insurance Guaranty Association was created to provide a resource for persons insured by or with claims against policies issued by an insurance company that has become insolvent. The act was intended to protect the insolvent insurers and the insolvent insurers' insureds." Eastern Press v. PetersonEngineering Co. No. 256063 (Dec. 10, 1991) 1991 Ct. Case Base 10658.
As a threshold matter, the strength of CIGA's suggestion that PEIC's claim is not a "covered claim"[2] because PEIC is neither an "insured" nor an "insolvent insurer", is diminished somewhat by language in CIGA v. Union Carbide, 217 Conn. 371
(1991). There, the Supreme Court held that "the claim of a tort victim . . . may be said to arise out of and be within the coverage and subject to the applicable limits of the policy so far as the insurer is concerned by virtue of General Statutes § 38-175, which provided that `[e]ach insurance company which issues a policy to any person . . . insuring against a loss or damage . . . for which such person . . . is legally responsible shall, whenever a loss occurs under such policy, become absolutely liable. . . .'" Id. at 379. Thus, a party other than an "insured" is apparently entitled to make a claim. CIGA's CT Page 8006 argument that the definition of "covered claim" in §38a-838(6), formerly § 38-275(4), encompasses only the claim of an insured and not an insurer such as PEIC is also refuted by the reference of that statute to `the claimant or insured' indicating that a claimant other than an insured might present a "covered claim". Id. at 380. Moreover, General Statutes §38a-844, formerly § 38-281, also refers to "[e]very insured or claimant seeking the protection of this chapter," again implying that a claimant other than an insured may present a "covered claim." Id. at 381-382.
CIGA has argued that the amendment to this statute effective in 1988, clarifying the definition of "covered claim", does not apply to PEIC's present claim arising out of a 1986 malpractice action seeking to recover damages for an incident which occurred during the 1983-84 policy period of an insurer which became insolvent before the effective date of the amendment. See, e.g.Prejean v. Dixie Lloyd's Ins. Co., 660 So.2d 303 (La. 1995). Even if this is so, PEIC nonetheless has the right to seek a judicial declaration of its rights vis a vis CIGA as it has done here. For example, the court in Phoenix Ins. Co. v. United States FireInsurance Company, 189 Cal.App.3d 1511 (1987), found no merit in the insurance guarantee association's reliance upon a provision of the California legislation, which is similar to ours, prohibiting actions against the association based upon an obligation to an insurer or on a right of subrogation:
 While the Insurance Code Provides generally that CIGA may be sued [citation omitted], actions based upon an obligation to an insurer or on a right of subrogation are excluded [citation omitted]. Nothing in the legislation, however, prohibits an insurer suing CIGA for a declaration of it rights vis a vis CIGA. [']It is properly within the competent authority of a court to hear a declaratory judgment action relating to the rights and obligations of two insurance companies as to the coverage of their respective policies, where the pleadings embrace and present this ultimate and controlling issue['] (Couch on Insurance (2d Rev. ed. 1983) § 74:148, p. 659). . . . .
 In the final analysis, Phoenix [Insurance Company's] lawsuit was based neither on an "obligation to an insurer" nor a "right of subrogation." It was based on a contention that CIGA wrongfully refused to perform its legal role and thereby wrongfully forced Phoenix [Insurance Company] to perform that CT Page 8007 role. Phoenix [Insurance Company] should not be punished for settling, in good faith, the malpractice claim instead of placing its own self interests before the interests of the injured client by first litigating a lengthy declaratory relief action. . . .
Id. at 1524-1525. Thus, independent of whether PEIC is a "claimant" or whether this is a "covered claim" as to PEIC within the meaning of the statute at the time of Ideal's insolvency, PEIC nonetheless has the right to seek the relief it seeks in this proceeding.
General Statutes § 38a-841(b) states, in pertinent part, that CIGA "shall be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties and obligations of the insolvent insurer as if the insurer had not become insolvent." Thus, if the insured of an insolvent insurer has met all of the preconditions mandated by General Statutes § 38a-836, et seq., CIGA is to "stand in the shoes" of the member insurer who has become insolvent. It is bound to perform those duties and obligations which the member insurer would have had if it had not become insolvent.
"The evident purpose of providing in § 38-282(1) [now General Statutes § 38a-845] for a reduction of a covered claim `by the amount of any recovery' from other available insurance was to prevent a person from twice receiving benefits for the same loss or otherwise obtaining a windfall, not to reduce the amount of a claim for a loss that remains partially unsatisfied." CIGA v. Union Carbide, supra, at 388. The court agreed "with those courts holding that statutory provisions similar to § 38-282 (1) [now General Statutes § 38a-845] were intended to apply only to prevent duplicate or windfall recoveries for losses sustained by an insured or a claimant resulting from insurer insolvency." Id. at 390.
CIGA's principal contention in this case is that, even if this is a "covered claim", PEIC's coverage must first "drop down" to fill the void left by Ideal's insolvency and then be exhausted before CIGA is obligated to step in. It appears that no Connecticut appellate level decision has directly addressed this issue. On the national level, however, the only type of policy language which has been found to trigger "drop-down" coverage involves policies where the excess insurer provided that it would cover the loss where the primary insurance policy was CT Page 8008 "inapplicable", but not when it was "uncollectible" or "unrecoverable" as in the case of an insolvency. See MissionNational Insurance Company v. Duke Transportation Company,792 F.2d 550, 598 (5th Cir. 1986); See, also Sifers v. General MarineCatering Company, et al., 892 F.2d 386 (5th Cir. 1990).
Guidance as to how to resolve the "drop down" issue may be found in Union Carbide, supra. There, the Connecticut Supreme Court agreed that it should examine the ways in which courts in other states interpret Insurance Guaranty Fund provisions which are analogous to General Statutes § 38a-845 (formerly § 38-282). The Court noted:
 In rejecting an argument similar to that raised by CIGA, the Supreme Court of Arizona declared: "In general, the legislative objective was to make the Fund liable to the same extent that the insolvent insurer would have been liable under its policy." Arizona Property and Casualty Ins. Guaranty Fund v. Herder, 156 Ariz. 203, 205, 751 P.2d 519
(1988). . . . [T]he Washington Court of Appeals has similarly stated that "the purpose of the exhaustion provision is to avoid duplication of recovery and prevent windfall judgments" in holding that a guaranty association "cannot offset payments by a primary insurer when it is standing in the shoes of an insolvent excess insurer." Washington Ins. Guaranty Association v. McKinstry Co., 56 Wash. App. 545, 544, 784 P.2d 190 (1990). . . . .
Id. at 390.
Thus, although CIGA's "drop down" argument finds support in one reported Connecticut Superior Court decision, Republic Ins.Co. v. North American Phillips Corp., 1991 WL 148921 (Conn.Super. July 24, 1991), it may be more useful to look to out-of-state appellate level cases. For example, in a well-reasoned decision, North Carolina Insurance GuarantyAssociation [NCIGA] v. Century Indemnity Company, 444 S.E.2d 464
(N.C.App. 1994), the court held that the language of the commercial umbrella insurance policy in question was not ambiguous and did not require the excess liability insurer to "drop down" and provide primary coverage after the primary insurer became insolvent. The court also noted that equitable subrogation is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it and arises when one person has been compelled to pay a CT Page 8009 debt which ought to have been paid by another and for which the other was primarily liable. Id. at 472.
That is very much the situation in this case, and the following excerpt from the NCIGA court's opinion applies with equal force here:
 In considering the purposes of the Guaranty Act, it is clear that our Legislature intended that insureds, such as Long, would have the full benefit of the statutory cap under the Guaranty Act, $300,000.00, when their insurer becomes insolvent. It could not have intended that the Association could use the statutory reference to "subrogation" as a shield against fulfillment of its statutory obligations. Principles of equity require the Association to reimburse [the excess carrier] for monies owed by the Association as the insurer for Long. This result would effectuate the purposes of the Act by encouraging the Association to promptly settle claims within its statutory limit. It would also prevent the Association from being rewarded for refusing to meet its statutory obligations. (Emphasis in original).
Id.
Indeed, many Federal as well as State Supreme and Appellate Courts, have concluded that similarly worded policies do not require drop down coverage. Washington Insurance GuarantyAssociation [WIGA] v. Guaranty National Insurance Company,685 F. Sup. 1160 (W.D.Wash. 1988); Transco Exploration Company v.Pacific Employers Insurance Company, 869 F.2d 862 (5th Cir. 1989)Hoffman Construction Company of Alaska v. Fred S. James Co.,836 P.2d 703 (Or. 1992); Alaska Rural Electric CooperativeAssociation v. INSCO Ltd., 785 P.2d 11 93 (Alaska 1990); MorbarkIndustries v. Western Employers Insurance Company, 429 N.W.2d 213
(Mich.App. 1988). See also Platex F.P. Inc. v. Columbia CasualtyCompany, 622 A.2d 1074, 1078 (Del.Super. 1992), noting that "[a]bsent policy language indicating that the parties intended to provide for insolvency drop down, the Court would be adding coverage which was not provided by the contract if it were to require insolvency drop down." This court finds these cases persuasive and therefore concludes that the PEIC coverage was not required to "drop down".
It is important to mention at this point that PEIC was not obligated to contribute monies toward the settlement, as it did, CT Page 8010 but it had the right to do so without prejudice in order to avoid a catastrophic loss. If a primary insurer refuses to settle or contribute its policy limits to a reasonable settlement offer, it has long been held that the excess insurer may make such a settlement and later seek to recover up to the limits of the primary policy. See, e.g., Aetna Casualty Surety Co. v. CoronetIns. Co., 44 Ill. App.3d 744, 358 N.E.2d 914 (Ill.App. 1976);Fireman's Fund Ins. Co. v. Security Ins. Co., 367 A.2d 864 (N.J. 1976).
CIGA also contends that under General Statutes §38a-845[3], a claimant is obligated to exhaust all of his available insurance prior to resort to CIGA and that Smith therefore had to exhaust all rights even against the insurers of Dr. Biondino before CIGA had any obligation to provide coverage. Under this theory, if Smith had obtained a verdict against Dr. Biondino and VMMC, Smith would have had to exhaust his rights against Dr. Biondino's insurers prior to resort to CIGA.
This argument is without merit. First, Smith brought separate claims against VMMC and Biondino. Whether Biondino's malpractice policy limits have been exhausted is irrelevant with respect to claims made against VMMC.
Second, Continental Casualty (Biondino's carrier) was only responsible for indemnifying Dr. Biondino for damages which flowed directly from Dr. Biondino's negligent acts. Continental Casualty agreed to pay James Smith a substantial sum in settlement of that claim. Smith's case against VMMC had nothing to do with Continental Casualty, and Smith had no right to additional monies from Continental Casualty based on VMMC's alleged negligence.
Unlike the instant case, in Harbor Ins. Co. v. CIGA,711 F. Sup. 70 (D.Conn. 1989) (and several other uninsured motorist cases cited by CIGA), it was undisputed that the injured party failed to exhaust his own uninsured motorist policy, the terms of which specifically "extended coverage to accidents involving motor vehicles for which the insurer becomes insolvent." Id. There is no claim here that Smith failed to exhaust any kind of policy available to him which extended coverage to him for incidents involving hospitals whose insurer became insolvent.[4]
In construing a policy of insurance, its terms must be given CT Page 8011 their natural and ordinary meaning. Kelly v. Figueiredo,223 Conn. 31, 35 (1992). The court will not torture the words of an insurance contract to find an ambiguity where none exists, and the words do not become ambiguous simply because lawyers or laymen contend for different meanings. Downs v. National CasualtyCo., 146 Conn. 490, 494-95 (1959). "[C]ourts cannot indulge in a forced construction ignoring provisions or so distorting them as to accord a meaning other than that evidently intended by the parties." Hammer v. Lumbermans Mutual Casualty Company, 214 Conn. 573,583 (1990).
CIGA contends in addition that, pursuant to General Statutes § 38a-838(g), it may not pay any amount due an insurer. For reasons touched upon in the discussion of whether this was a "covered claim" as to PEIC, this argument also fails. The purpose of that statute cannot be to punish an excess carrier for negotiating a good faith settlement of a claim on behalf of an insured who has been left, as the plaintiffs aptly put it, "twisting in the wind" by the primary insurer's insolvency and CIGA's refusal to step in the shoes of the primary insurer.
Again, although there is no Connecticut case law which directly interprets this portion of the statute, in Phoenix Ins.Co. v. United States Fire Insurance Company, supra, the California Appellate Court found that the purpose behind the equivalent California entity (also known by the acronym "CIGA") was to spread throughout the industry a loss suffered by an insured as the result of the insolvency of an insurer. The Court ruled that it was inconsistent with that purpose and objective to permit CIGA, arbitrarily, to impose such a loss on a single insurer by refusing to participate in good faith efforts to settle with an insured, 189 Cal.App.3d at 1525, or abandoning an insured any time an argument can be made that other insurance is available. Id. at 1524 n. 12. "It would be patently unfair to allow CIGA to evade its statutory mandate while simultaneously permitting it to use the same statutes as a shield against an action such as the one here thereby saddling an innocent carrier with the entire loss resulting from [the primary carrier's] insolvency. This would serve to give CIGA unfettered discretion in determining the extent of its participation in any given case and make it ultimately unaccountable to the judiciary — a result clearly not intended by the Legislature." Id. at 1524-1525. See,also, Aetna Casualty Surety Co. v. Coronet Ins. Co.,44 Ill. App.3d 744, 358 N.E.2d 914 (Ill.App. 1976). CT Page 8012
Courts have generally upheld the rights of the insured and excess carrier to settle a case in which the primary insurer wrongfully refused to contribute its policy limits. In Fireman'sFund Ins. Co. v. Security Ins. Co., 367 A.2d 864 (N.J. 1976), the injured plaintiff, in a malpractice suit, offered to settle his claim within the policy limits of the combined policies of both the primary and the excess carriers. The insured and the excess insurer urged the primary to join in accepting the settlement offer, but the primary carrier stubbornly refused to contribute its comparatively small limits. Thereafter, the insured, with the financial assistance of the excess carrier, settled the case and assigned its rights for bad faith refusal to settle to the excess carrier that then brought an action for payment of the primary limits against the primary carrier.
The trial court found bad faith on the part of the primary insurer and awarded its limits plus interest to the excess carrier. On appeal, the Supreme Court of New Jersey ruled that if an insurer refuses to accept an offer to settle within the policy limits, the insured may make a reasonable settlement and then proceed against the primary insurer, and recover if he establishes bad faith in the insurer's refusal to settle.
While the CIGA statutes prohibit bad faith causes of action against CIGA, the public policy considerations that motivated the New Jersey Supreme Court require that if CIGA is standing in the shoes of the insolvent primary carrier and wrongfully refuses to contribute toward a settlement, the insured and the excess carrier ought to have the right to settle the matter and later seek a judicial determination of their rights with respect to CIGA. The plaintiffs do not claim bad faith on the part of CIGA, but only that it has inaccurately interpreted the law. If they are correct in this contention, and this court believes that they are, they should be entitled to be left in the position in which a correct interpretation of the law would initially have placed them.
Finally, by way of its Sixth Special Defense, CIGA claims that VMMC failed to obtain CIGA's consent prior to settling the action brought by Smith, but neither VMMC nor PEIC have a duty to obtain such consent. Moreover, even if such a duty did exist, seeking consent would have been futile in light of CIGA's refusal to indemnify, and the law does not require a party to undertake a futile act. Luttinger v. Rosen, 164 Conn. 45, 47 (1972); Vachonv. Tomascak, 155 Conn. 52, 57 (1967); Tracy v. O'Neill, 103 Conn. 693, CT Page 8013 699 (1925).
There are no material facts in dispute in this case. The law requires CIGA to stand in Ideal's shoes. It does not require PEIC's policy to drop down and be exhausted first, nor does it require that the policy of another tortfeasor, who is alleged to have been negligent toward the malpractice plaintiff in ways other than claimed against VMMC, first be exhausted. It is appropriate for both VMMC and PEIC to seek declaratory relief under our law, and CIGA's indemnification of PEIC under the circumstances would not be a prohibited payment to an insurer in light of PEIC's good faith payment to protect VMMC when faced with CIGA's abdication of its statutory responsibilities.
For all of the above reasons, the plaintiffs are entitled as a matter of law to a declaratory judgment that CIGA is obligated to indemnify VMMC and PEIC in the amount of $300,000, less the $100 statutory deductible, for a total of $299,900.
The plaintiffs' motions for summary judgment are therefore granted, and that of the defendant is denied.
Jonathan E. Silbert, Judge