199 Ill. App.3d 685 (1990)
557 N.E.2d 475
CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Cotrustee, Petitioner,
v.
SAMUEL WILLIAM SAX et al., Indiv. and as Cotrustees, et al., Respondents (Edward L. Sax et al., Counterplaintiffs-Appellants; Continental Illinois National Bank and Trust Company of Chicago, Cotrustee, Counterdefendant-Appellee).
No. 1-88-3367.
Illinois Appellate Court  First District (5th Division).
Opinion filed May 25, 1990.
Rehearing denied July 18, 1990.
*686 *687 *688 Joyce & Kubasiak, P.C., of Chicago, for appellants.
Mayer, Brown & Platt, of Chicago, for appellees.
Affirmed in part, and vacated in part and remanded.
PRESIDING JUSTICE COCCIA delivered the opinion of the court:

INTRODUCTION
This appeal arises from appellee Continental Bank, N.A.'s administration of two trusts. Appellants Edward L. Sax and George J. Sax filed a counterclaim against appellee, which the circuit court dismissed. Subsequently, the circuit court awarded appellee regular trustee fees, as well as extraordinary trustee fees and attorney fees for defending against the counterclaim. For the following reasons, we affirm the circuit court's dismissal of appellants' counterclaim, and affirm its award of regular trustee fees to appellee, but vacate the award of extraordinary trustee fees and remand for further proceedings.

BACKGROUND
The will of George D. Sax (settlor) was admitted to probate in 1974. Settlor's will provided for the creation of a family trust and a marital trust. The cotrustees of both trusts were Rhoda Sax, settlor's wife, and Samuel W. Sax, his son. Exchange National Bank was the corporate trustee. The family trust was to pay Rhoda income for life. Upon her death, its assets were to be divided into separate, equal trusts for her children. The marital trust was to pay Rhoda income for life; she was also given a power of appointment, to distribute that trust's assets. In October of 1977, appellee succeeded Exchange as corporate trustee.
Rhoda died in December of 1977. She was survived by three sons: Samuel, Edward, and George. Rhoda exercised her power of appointment by will in favor of Edward and George, to the exclusion of Samuel. Upon his mother's death, Edward became a cotrustee of the *689 family and marital trusts, joining Samuel and appellee.
Following Rhoda's death, disputes arose between the Sax brothers regarding the trusts. Edward and George were aligned upon one side of the quarrel, with Samuel upon the other side. Appellants requested that appellee make distributions from the trusts, but Samuel opposed them. In addition, he challenged the distribution of assets between the marital and family trusts, claiming that the family trust should have a larger share allotted to it. Samuel likewise challenged Rhoda's will, calling into question his mother's exercise of her power of appointment.
In July of 1978, appellee filed a petition for instructions in chancery, requesting the circuit court's guidance in exercising its administrative responsibilities under the trusts. Appellee alleged that orderly trust administration was frustrated by the Sax brothers' quarrel. Matters were also complicated, appellee averred, by the fact that the trusts were defendants in lawsuits brought by Exchange's shareholders (settlor had been an officer of that bank).
By way of answer to the petition, appellants asserted that appellee breached its fiduciary obligations to them by not making distributions from the trusts. And, at a hearing held on December 8, 1978, appellants' counsel stated that they were considering a counterclaim against appellee.
After Rhoda's will withstood Samuel's challenge, appellants renewed their demand for distributions. Appellee filed a supplemental petition for instructions on November 27, 1978. On December 11, 1978, over Samuel's objection, the circuit court ordered $333,879.94 distributed from the marital trust to appellants. The circuit court also prescribed a formula for future distributions of the trusts' income that was not in dispute. But as the brothers' disagreements continued, the circuit court continued to supervise administration of the trusts.
On May 7, 1985, however, the Sax brothers apparently reconciled their differences in the jury room of Judge Harold Siegan's court. A handwritten document entitled "Points of Settlement" was drafted. This document (draft order) provided:
"In the matter of Continental Bank v. Sam Wm. Sax et al, the parties agree to the following outline of settlement:

1. $300,000 cash shall be paid to the Samuel Wm. Sax trust under the Family Trust.
2. $100,000 shall be paid to the principal of the Edward Sax Trust, and $100,000 shall be paid to the principal of the George Sax Trust.
3. The balance of all assets of both the Marital and the *690 Family Trusts shall be added to the Marital Trust to be distributed as provided therein.
4. The parties agree to resign or decline to act as follows:
a) as to the Samuel Sax Trust Ed Sax shall resign and
George Sax shall decline to act.
b) As to the Ed Sax Trust, Sam shall resign.
c) As to the George Sax Trust, Sam shall resign.
5. The Trustees shall set aside $100,000 for the payment of fees. Amounts from this sum not so expended shall be divided in 3 equal portions to be added to the Sam Sax Trust, the Ed Sax Trust and the George Sax Trust.
6. All attorneys shall submit petitions for attorneys fees on or before May 21, 1985.
7. If the total assets (including for this purpose the State and Randolf [sic] note to the estate at face amount of $360,000) shall exceed $1,900,000, then 1/6 of the excess over that amount shall be paid to the Sam Wm. Sax Trust.
8. This agreement is intended to resolve the probate court proceedings in this matter as well." (Emphasis added.)
The draft order was signed by the Sax brothers and their attorneys.
Appellants' counsel then drafted an agreed order (agreed order) implementing the draft order. After negotiations among the parties  including appellee  the agreed order was entered on June 13, 1985. The agreed order includes the provisions of the draft order, set forth in greater detail. The former also includes many terms not found in the latter, such as:
"12. This court will consider the request of CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO [now appellee] for leave to resign as Co-Trustee of the various trusts created under the Last Will of George D. Sax immediately following the approval, if any, of the Co-Trustees' accounts; THAT
* * *
16. Each of the parties hereto expressly AGREES to, and does hereby, WAIVE, his, her, or its right to appeal this Order; AND THAT:
17. The matters in controversy between the parties having been resolved by the aforesaid settlement, there is no further need for a guardian ad litem in this cause, and HOWARD KORENGOLD, previously appointed as guardian ad litem, is hereby discharged.
IT IS SO STIPULATED AND AGREED * * *."
*691 The agreed order was signed not only by the Sax brothers, but also by appellee and the guardian ad litem, who had been appointed by the court to protect the interests of minor beneficiaries and unborns.
Appellee filed its final accounting and moved for approval on August 1, 1985. On July 25, 1985, the firm of Joyce and Kubasiak, P.C., moved for leave to appear as appellants' additional counsel, stating that they had been retained for the purpose of determining whether to raise objections to appellee's accounts. On October 1, 1985, Joyce and Kubasiak filed a document labelled "Objection to Accounting And Counterclaim To Surcharge Co-Trustee For Damages For Breach Of Trust" (counterclaim) on behalf of appellants, naming appellee as counterdefendant. In count I, appellants charged appellee with breach of the duty of good faith; count II pleaded breach of the duty of impartiality; count III alleged breach of the standard of care over investments; and count IV averred breach of the duty of loyalty. They prayed for $30 million in compensatory damages, and $60 million in punitive damages. Although appellants did not name Samuel as a counterdefendant, the counterclaim called their brother's conduct into question. For example, appellants claimed that appellee's actions favored Samuel's "malicious self-interest." They further claimed that Samuel's interests were adverse to theirs, and that he could not have been expected to act in good faith for their best interests, notwithstanding his fiduciary duties to them as cotrustee.
Appellee moved to dismiss appellants' counterclaim, pursuant to section 2-619 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2-619). Appellee argued that the counterclaim was barred by the agreed order, since it recited that all matters in controversy had been settled, and since it included a waiver clause. The circuit court granted appellee's motion on June 24, 1987, for those reasons.
On July 22, 1987, appellants moved to reconsider the dismissal order. Along with their motion, they presented the affidavits of eight persons present at the negotiations that resulted in the draft order, in order to bolster their argument that the agreed order did not bar their counterclaim. The circuit court denied appellants' motion on December 23, 1987.
Appellants then sought the entry of an immediately appealable order, and appellee sought approval of its accounts, as well as extraordinary trustee fees and attorney fees for defending against the counterclaim. On August 8, 1988, the circuit court entered an order denying appellants' request for an immediately appealable order. This order also stated that, so as to expedite the entry of an appealable order, appellants waived the right to conduct discovery and to present evidence *692 concerning the approval of appellee's accounts and its request for extraordinary trustee and attorney fees. The order likewise provided that in the event such fees were awarded, appellants and appellee acknowledged that they would not be borne by or paid from Samuel's trust.
On October 12, 1988, the circuit court entered several orders that resolved all matters pending. Specifically, the circuit court awarded appellee $12,293.27 in extraordinary trustee fees, $135,523.75 in attorney fees, and $9,428.11 in expenses. The circuit court approved appellee's accounts from January of 1978 to June 13, 1985, "in all respects," and it approved appellee's accounts for the period from June 14, 1985, to April 28, 1988. Appellants have taken their appeal from these orders.

ANALYSIS

THE SETTLEMENT ISSUE
The parties are in agreement regarding the law that governs the interpretation of the draft and agreed orders: the law of settlements and releases. Their principal disagreement concerns which order is dispositive. Appellee takes the position that the agreed order, to which it was a party, included a settlement of the case it commenced, as well as a release of appellants' mismanagement claims. In contrast, appellants argue that the earlier draft order, to which appellee was not a party, represented a settlement of the brothers' quarrel only and that they did not release their claims against appellee.
In particular, appellants contend that they did not settle with appellee or release it, because their mismanagement claims aligned all beneficiaries against it; because they had filed no claim against appellee before the settlement conference, and no reference to their claims is made in either the draft or agreed orders; because they did not intend to release appellee; and because appellee could not be discharged until its accounts had been approved. Appellants' contentions fail to convince us that the circuit court erred in ruling that their counterclaim was barred by the agreed order.
 1 Addressing these points in the foregoing order, we cannot say that the counterclaim aligned all beneficiaries  appellants as well as Samuel  against appellee. Edward and Samuel were not merely co-beneficiaries. They were also cotrustees who disagreed with each other regarding administration of the trusts. Appellants inaccurately portray this case as one in which the Sax brothers were pitted against appellee, when the dispute between the beneficiaries sent appellee to *693 court in the first place. More importantly, a reading of appellants' counterclaim reveals that it necessarily called the conduct of their brother and cobeneficiary, Samuel, into question. Among other things, the counterclaim implicitly  but unmistakably  accuses Samuel of breaching fiduciary duties to further his "malicious self-interest." If appellants' counterclaim were reinstated, appellee would almost certainly be required to implead Samuel in order to protect its interests. That is, if Samuel's conduct as cotrustee caused appellee to breach its fiduciary duties to appellants, a rational trustee in appellee's position would look to him. As a result, were we to accept appellants' portrayal of the settlement as one between the Sax brothers only, it would have been scuttled nonetheless by the counterclaim.
 2 The facts that no counterclaim had been filed before the settlement conference and that the draft and agreed orders make no reference to the mismanagement claims are of no moment. Appellants were undeniably unhappy with appellee's conduct long before the May 1985 conference. As stated above, they accused it of breach of fiduciary duties as early as 1978; that same year they also threatened to bring a counterclaim. Moreover, in Rakowski v. Lucente (1984), 104 Ill.2d 317, 320, 472 N.E.2d 791, 793, our supreme court rejected the notion that a release does not cover claims not yet in existence unless they are specifically mentioned. Indeed, an attempt to list particular types of actions in a broadly worded release  such as the agreed order at issue here  can detract from its general scope. See Rakowski, 104 Ill.2d at 323, 472 N.E.2d at 794.
 3, 4 Likewise, we are not moved by appellants' assertion that it was their expressed intent, both during and after the May 1985 negotiations, not to release appellee. Where a release is clear and explicit, a court must enforce it as written. (See Rakowski, 104 Ill.2d at 323, 472 N.E.2d at 794.) The agreed order plainly states that all matters in controversy, apart from the final accounting, have been resolved, and that all parties waive their rights to appeal. Both an instrument's meaning and the parties' intent must be gathered from its face, without the assistance of parole evidence or other extrinsic aids. (See Rakowski, 104 Ill.2d at 323, 472 N.E.2d at 794.) In Rakowski, counterplaintiff submitted an affidavit in opposition to counterdefendant's motion to dismiss his counterclaim, alleging that he did not intend to release his claim. Yet the supreme court upheld the circuit court's dismissal of the counterclaim. We take a similarly dim view of appellants' eight affidavits, which they submitted in support of their motion to reconsider the circuit court's dismissal of their counterclaim. Rakowski also stands for the proposition that a unilateral or *694 self-induced mistake is not a valid ground for setting aside an unambiguous release; rather, such a result can only be achieved if a mutual mistake, material to the transaction and affecting its substance, is clearly and convincingly established. (104 Ill.2d at 324, 472 N.E.2d at 794.) Thus, were we to assume for argument's sake that appellants did not intend to release appellee  which is the gist of their affidavits  the circuit court's ruling would still be correct, since the agreed order is unambiguous, and since there is no evidence of mutual mistake. It is also important to keep in mind the fact that appellants' original counsel drafted the agreed order and that he played a leading role in the subsequent negotiations which resulted in its entry. Compare Barth v. Reagan (1986), 146 Ill. App.3d 1058, 1067-68, 497 N.E.2d 519, 525-26 (where party's attorney submitted a stipulation stating that all claims were settled, appellate court construed language against that party).
 5 The fact that no trustees could be discharged until final accounts were approved does not lead us to the conclusion that the circuit court improperly dismissed appellants' counterclaim. Simply stated, a final accounting had not been completed as of June 1985. Legitimate questions might have arisen, for instance, as to whether the trusts' assets had been properly divided. While the counterclaim filed by Joyce and Kubasiak was also styled as an "Objection" to appellee's accounts, it can more accurately be described as an attempt to avoid the agreed order's consequences. In fact, the counterclaim makes no mention of appellee's accounts. We repeat that the counterclaim did not merely call appellee's conduct into question. It similarly called into question the conduct of appellee's cotrustee, and appellants' cobeneficiary, Samuel. We think the circuit court saw the counterclaim for what it truly was: an attempt to present mismanagement claims in the guise of an objection.
 6 In Rakowski, the supreme court identified policy concerns that are also relevant to our case:
"As a matter of public policy the settlement of claims should be encouraged. * * * Holding the parties to the language of their release has the advantage of providing certainty and thereby encouraging settlement." (104 Ill.2d at 325, 472 N.E.2d at 795.)
After reading the agreed and draft orders together we cannot say that the circuit court erred in ruling that the agreed order barred appellants' counterclaim, on the grounds that it settled all matters in controversy and that the parties who executed it waived their appeal rights. The agreed order was typewritten, it was signed by all parties, *695 it incorporated the provisions of the draft order in greater detail (7 pages and 17 paragraphs when compared to two pages and eight paragraphs of the draft order), and it explicitly recited that all matters in controversy were resolved and that all parties waived their right to appeal. The earlier draft order was handwritten, it was signed by fewer than all parties, and its plain language stated that it was merely an "outline of settlement." The Sax brothers had to work out their differences initially, before the other parties  including appellee  could join in the settlement negotiations; after all, it was the brothers' quarrel that prompted appellee to petition the circuit court for instructions in the first instance. In brief, this case has been pending in the courts for nearly 12 years, and tens of thousands of dollars in fees have been incurred. The parties agreed to terminate this litigation in June 1985, and we shall hold them to that agreement.
 7 We close our discussion of this question by noting, again, that the parties in this case joined issue over the law which governs settlements and releases. The terms of the agreed order provide that the parties settled the case commenced by appellee, and that appellants released their mismanagement claims. But the agreed order can also be analyzed, perhaps more accurately, in light of principles drawn from cases construing such orders. These cases define an agreed order as a recordation of an agreement between the parties, rather than a judicial determination of their rights. (See, e.g., Cooper v. Bi-State Development Agency (1987), 158 Ill. App.3d 19, 22, 510 N.E.2d 1288, 1290.) Such an order is not generally subject to appellate review; it is conclusive upon the parties and can be amended or set aside only on a showing that it resulted from fraudulent misrepresentation, coercion, incompetence of one of the parties, gross disparity in the parties' position or capacity, or newly discovered evidence. (See In re Haber (1981), 99 Ill. App.3d 306, 309, 425 N.E.2d 1007, 1009.) No such showing has been made in this case, so the agreed order must stand. Indeed, at the time the agreed order was drafted, negotiated, executed, and entered, all parties were represented by counsel.

THE FEES ISSUES
Concerning the fees awarded by the circuit court, appellants contend that appellee should have been surcharged for the investment management fees it charged the trusts for the period between June 1985 and April 1988. Appellants additionally contend that the circuit court erred in awarding appellee extraordinary trustee fees and attorney fees for defending against their counterclaim. While we are of the opinion that the circuit court properly refused to surcharge appellee, *696 we are also of the opinion that it erred in awarding the other fees.
Turning first to the award of regular trustee fees, we observe that appellants have cited no authority in support of the proposition that appellee was not entitled to investment management fees, or that the circuit court erred in awarding such fees. The essence of appellants' complaint appears to be that appellee did nothing to manage the trusts' investments; instead, it acted only as a custodian of the trusts' assets. Appellee replies that it performed numerous services, including the preparation and distribution of quarterly cash statements and investment reviews, and the coordination of stock purchases at appellants' insistence.
 8 It has been held that a trustee should not be surcharged for matters as to which there is no fault or liability on its part, or no loss or damage suffered by the estate or beneficiaries. (See First Midwest Bank v. Dempsey (1987), 157 Ill. App.3d 307, 315, 509 N.E.2d 791, 797.) Appellee cannot be faulted for its management of the trusts from June of 1985 until April of 1988, as its hand was forced by appellants' conduct in pressing the counterclaim. In addition, we have seen no evidence that the beneficiaries suffered any loss or damage as a result of appellee's conduct during this period. Therefore, we cannot say that the circuit court abused its discretion in awarding regular trustee fees or refusing to surcharge appellee. See Durdle v. Durdle (1986), 141 Ill. App.3d 12, 15, 489 N.E.2d 1142, 1145.
 9 Finally, we come to the more complex question of the extraordinary trustee fees and attorney fees awarded by the circuit court. The parties agree that the resolution of this issue is governed by a line of cases which can be traced to Patterson v. Northern Trust Co. (1919), 286 Ill. 564, 122 N.E. 55. Patterson says that a trustee not at fault is entitled to be reimbursed for all expenses properly incurred in administration of the trust. (286 Ill. at 567, 122 N.E. at 56.) Appellants reason that the award cannot stand, because the circuit court did not explicitly find appellee to be without fault. Appellee replies that the circuit court implicitly found it to be without fault, by approving its accounts "in all respects"; in other words, we should not give talismanic importance to the phrase "without fault."
 10 Regrettably, the parties' arguments overlook the fact that, as previously stated, they agreed in the circuit court that Samuel would not be liable for any fees that might be awarded as a result of appellee's defense against the counterclaim. This is a matter of no small importance, because Illinois courts appear to apply different rules depending upon whether all beneficiaries, or only some, will be taxed for such fees. As Patterson declares:

*697 "Where a beneficiary brings a suit against his trustee which is groundless, the solicitor's fees and expenses of the trustee in defending the charge are to be paid out of the share of the complainant in the trust estate and not charged against the estate generally nor a general fund by which co-beneficiaries would have to contribute. The suit by Patterson [complainant] was frivolous, oppressive and a wrongful attempt to relitigate matters already decided, and the rule that his share of the trust estate should pay the expenses applies with all its force." (286 Ill. at 567, 122 N.E. at 56-57.)
This rule was cited with approval in Webbe v. First National Bank & Trust Co. (1985), 139 Ill. App.3d 806, 809-11, 487 N.E.2d 711, 713-14; see also Brown v. Commercial National Bank (1968), 94 Ill. App.2d 273, 280-81, 237 N.E.2d 567, 571, aff'd (1969), 42 Ill.2d 365, 247 N.E.2d 894.
Hamilton v. Nielsen (7th Cir.1982), 678 F.2d 709, contains a thought-provoking discussion of Illinois law on this question. Judge Posner reasoned that if the litigating beneficiary prevails, the other beneficiaries might benefit from a ruling that the trustee has been guilty of mismanagement and is liable for a surcharge. Under this scenario, the litigating beneficiary would receive only a fraction of the total benefits conferred by such efforts. An asymmetry results if, in the event the litigating beneficiary loses, there is a levy against that beneficiary's share. Such a rule might dissuade beneficiaries from attempting to enforce legitimate claims against trustees. See Hamilton, 678 F.2d at 715.
 11 Be that as it may, we need not inquire into the justice of applying this rule in our case, because the parties have conceded that Samuel's share will not be taxed for the extraordinary trustee fees or attorney fees. In other words, since the parties have, in effect, agreed about which rule is to be applied, they shall not be heard to complain of its consequences. It is clear, however, that the circuit court did not apply the standard set forth in Patterson and its progeny, which obtains when only the litigating beneficiaries' shares are to be taxed. Consequently, while the circuit court may not have committed an abuse of discretion per se, reversal is required since it did not apply the correct legal standard in reaching a discretionary ruling. (See Eisenberg, Appellate Review of Discretionary Judicial Determinations, 2 Appellate Law Review 8, 12 (1990).) We conclude, then, that on remand the circuit court must decide whether appellants' counterclaim met the standard annunciated in Patterson and its progeny for taxing the shares of litigating beneficiaries. If so, appellee is entitled *698 to extraordinary trustee fees and attorney fees in the amounts previously determined by the circuit court, as appellants waived their right to conduct discovery or to present evidence regarding the amount of those fees. But if the relevant standard is not satisfied, appellee is not entitled to such fees.

CONCLUSION
In sum, we hold that the circuit court correctly dismissed appellants' counterclaim on the grounds that it was barred by the agreed order. Additionally, we hold that the circuit court properly awarded appellee regular trustee fees and properly refused to surcharge it. But we vacate the award of extraordinary trustee fees and attorney fees and remand for further proceedings consistent with this opinion.
Affirmed in part; vacated in part and remanded with directions.
LORENZ and MURRAY,[*] JJ., concur.
NOTES
[*] Justice R. Eugene Pincham participated in this case prior to his resignation. Since that time, Justice James C. Murray was designated the third member of the panel and has read the record and briefs and has listened to the oral argument tapes.