**WHITING CORPORATION, Plaintiff,**

v.

**HOME INSURANCE COMPANY, Defendant.**

**No. 80 Civ. 2377 (GLG).**

United States District Court, S. D. New York.

June 16, 1981.

**644**

Debevoise, Plimpton, Lyons & Gates, New York City, for plaintiff; Robert L. King, Christopher A. Alberti, Mitchell A. Karlan, New York City, of counsel.

Townley & Updike, New York City, for defendant; Philip D. Pakula, Michael S. Belohlavek, Richard B. Kelsky, New York City, of counsel.

## MEMORANDUM DECISION

GOETTEL, District Judge.

The defendant, Home Insurance Company ("Home"), seeks to dismiss the second, third, fourth, and fifth causes of action of the plaintiff's complaint.

The plaintiff, Whiting Corporation ("Whiting"), is a producer of industrial equipment. It was named as a third-party defendant in 1975 in an action brought in federal district court in Maine by a pulp and paper company against the general contractor that had built its plant in Maine. The pulp and paper company sought $22 million in damages in that action, claiming, inter alia, that a piece of equipment manufactured by Whiting failed to meet specifications and was otherwise deficient. In 1978, the pulp and paper company sued Whiting directly, seeking $16 million from it.

At the time these suits were commenced, Whiting had four layers of insurance coverage. The first layer was in the amount of $250,000 per incident, with a maximum of $500,000. This primary coverage was provided by Continental Insurance Company ("Continental"), which also had the obligation of defending claims against Whiting. The second layer of insurance, in the amount of $5 million, was provided by Home. There were two additional $5 million excess layers on top of this provided by other companies. Whiting settled the suits against it in July of 1979 for $671,000. Continental paid $250,000. Whiting seeks the remainder from Home in this action, claiming that Home's policy insured Whiting against such losses. (This is the substance of the first cause of action.)

The second, third, fourth, and fifth claims concern the actions (or, more accurately, inaction) of Home during the years the Maine suits were in litigation.

The original suit brought by the pulp and paper plant company was commenced in October of 1974, and the third-party action was commenced in January of 1975.[1] Upon being served with the third-party complaint, Whiting, through its insurance brokers, notified all four of its insurance carriers. All of these carriers, except Home, acknowledged receipt of the notification. The primary carrier, Continental, retained a Bangor, Maine law firm to defend Whiting. The second-tier excess carrier (which insured Whiting to the extent of $5 million for judgments in excess of $5,250,000) advised Whiting that it was retaining the same law firm. It also notified Whiting, as did the top-tier excess carrier, that Whiting had the right to employ its own counsel, since the indemnity sought exceeded its total umbrella coverage. At that time, Whiting notified the Bangor attorney retained by its primary carrier that it saw no need to engage independent counsel because there was only a remote possibility of exposure above its total insurance coverage.

Whiting fulfilled all of its formal notice requirements to its insurance carriers and,

---

1. The third-party action was brought against three subcontractors, of which Whiting was one.

in September of 1975, notified its insurance brokers, with copies to all four carriers, that it was looking to them for complete indemnification and protection, including the payment of all costs and attorneys' fees.[2] Nevertheless, for a period of three years, Home did not communicate directly or indirectly with Whiting. Home kept abreast of the litigation, however, by obtaining information from claims agents for the other carriers.

Apparently, as early as March of 1976, Home considered sending a reservation of rights letter to Whiting.[3] During the middle of 1976, the other two excess carriers, apparently concerned about Home's position, sent formal notification to Home of their exposure and inquired as to whether Home intended to issue a reservation of rights letter. It was not until October of 1976 that Home started to make any extensive investigation of the nature of the claim. By early 1978, it had learned of settlement overtures under which Whiting would be called upon to pay a sum in excess of that covered by the insurance of the primary carrier.

Following the filing of the direct claim against Whiting in March of 1978, and notification thereof, Home sent a reservation of rights letter to Whiting on May 19, 1978. This was forty-one months after Home was first notified of the original suit. At the time the letter was sent, one of Home's employees noted that such a letter should have gone out "quite some time ago." In the reservation of rights letter, Home relied upon a single policy provision, that of exclusion of claims involving defective products sold by the insured.

In June of 1978, the claims agent notified Home's main representative that the chances of successfully denying coverage were less than fifty-fifty, that a settlement would be in the millions, and that it was obvious that Home, as first excess carrier, had considerable prospective exposure.

Similar communications were sent by trial counsel. On May 17, 1979, Home declined coverage, but based its declination on Endorsement No. 8 of the policy. Whiting's house counsel immediately wrote to Home decrying this action, pointing out that the litigation had already progressed to a critical point and that Whiting had to decide whether to proceed to trial or to contribute an amount in excess of its primary coverage in order to settle. Whiting advised Home that it intended to seek indemnification for all liabilities and expenses incurred as a result of the disclaimer.

The second and third causes of action concern Home's delay of more than three years in communicating with Whiting, as a result of which Whiting believed its interests were protected to the full extent of the excess coverage and thus surrendered control of its defense. The second cause of action labels this conduct on the part of Home as an estoppel. The third cause of action denominates it a waiver.

The fourth and fifth causes of action arise from the reservation of rights letter of May 19, 1978, which relied upon a particular exclusion and made no reference to Endorsement No. 8. In the fourth cause of action, Whiting claims that the original reliance solely on one exclusion created an estoppel with regard to any other basis for denying coverage. In the fifth cause of action, Whiting contends that this conduct amounted to a waiver.

In moving to dismiss those four causes of action, Home takes the sweeping position that an excess carrier is *never* obligated to declare its position with respect to coverage until the underlying lawsuit has been reduced to judgment and, consequently, can never waive or be estopped from claiming any defenses under its policy. It is unquestionably true that, as an excess carrier, under its policy terms, Home did not need to assume charge of the defense or settlement of a suit brought against Whiting.

---

2. Home denies receiving this communication, although it acknowledges receipt of later and prior notices and also acknowledges its full awareness of the suit.

3. The primary carrier had, at one point, made a reservation of rights claim, which was rejected by Whiting.

Moreover, its liability did not attach until the amount covered by the primary carrier ($250,000) had been paid.

Whiting contends, on the other hand, that all insurers, primary or excess, have a duty when notified of a claim to advise the insured with reasonable promptness of their position with respect to coverage. Whiting also argues that, while the obligations of an excess carrier are clearly narrower than those of the primary carrier, who must defend the action, primary and excess carriers alike have similar duties to indemnify.

■ The law appears quite clear that, if a primary carrier that undertakes to defend its insured does not promptly notify the insured that the defense is undertaken pursuant to a reservation of rights (or institute a declaratory judgment action), the carrier is estopped from later denying coverage. *See Textile Machinery, Inc. v. Continental Ins. Co.*, 87 Ill.App.3d 154, 42 Ill.Dec. 506, 409 N.E.2d 1 (1980); *Apex Mutual Insurance Co. v. Christner*, 99 Ill.App.2d 153, 240 N.E.2d 742, 747 (1968); *Bourne v. Seal*, 53 Ill.App.2d 155, 203 N.E.2d 12, 18 (1964);[4] 14 *Couch on Insurance 2d* § 51:77 (1965). The reason for this, as stated by the Illinois Supreme Court, is:

> "[t]he claim might be of such a character as that the amount of damages recovered in a lawsuit by the injured party would exceed the indemnity and subject the insured to considerable loss and damage, and therefore the insured should have a right to know with reasonable promptness the attitude of the indemnity company, so that he might be in a position to take such action as would not only protect the indemnity company, but save himself from loss and damages."

*Krutsinger v. Illinois Casualty Co.*, 10 Ill.2d 518, 141 N.E.2d 16, 21 (1957) (quoting *Interstate Casualty Co. v. Wallins Creek Coal Co.*, 164 Ky. 778, 781, 176 S.W. 217, 219 (1915)). Indeed, Home seems to concede that a primary carrier can be estopped by a failure to disclaim coverage, but it maintains that this can never occur with respect to an excess insurer. Neither party, however, has found a case squarely on point with respect to the actions of an excess insurer.

■ With respect to the waiver claims, Home relies heavily upon the recent decision of the New York Court of Appeals in *Albert J. Schiff Associates, Inc. v. Flack*, 51 N.Y.2d 692, 417 N.E.2d 84, 435 N.Y.S.2d 972 (1980). That case stands for the propositions that an extension of coverage cannot be obtained by waiver and that waiver requires proof that the insurer intended to abandon a defense. *See* 51 N.Y.2d at 698, 417 N.E.2d at 87, 435 N.Y.S.2d at 975. That case, however, concerned a company that promptly denied liability on certain grounds based on three policy exclusions and, ultimately, claimed that the policy simply did not cover the claim in suit. Nevertheless, this Court is inclined to agree that the inaction of Home did not amount to a waiver, which, according to *Bouvier's Law Dictionary*, is the "intentional relinquishment of a known right," and that the initial assertion of one policy defense does not waive the right to rely upon other portions of the policy.

■ Estoppel, however, is a different creature from waiver. It is true, as argued by Home, that silence, without more, cannot give rise to estoppel and that a party cannot be estopped by silence where there is no duty and opportunity to speak. *See Town & Country Bank v. James M. Canfield Contracting Co.*, 55 Ill.App.3d 91, 12 Ill.Dec. 826, 829, 370 N.E.2d 630, 633 (1977). But the issues here are whether, under the circumstances described above, Home had an obligation to speak and whether Whiting has been prejudiced by its failure to do so.

■ A motion to dismiss does not lie unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McLain v. Real Estate Board of*

---

4. The parties agree that Illinois law applies, but it seems that the law of Illinois does not differ markedly from New York's law.

*New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). *Accord, Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam); 2A *Moore's Federal Practice* ¶ 12.08, at 2274 n.6 (2d ed. 1968 & Supp. 1980). Home contends that Whiting cannot have been prejudiced unless it was under the impression that coverage was a possibility under the policy. This, however, raises a factual issue. Whiting claims that its surrender of control of the litigation to counsel selected by the insurance carriers was based on the belief that it had a solid line of coverage. It cannot be said, as a matter of law, that Whiting would not have pursued a different strategy with respect to the litigation, or that it would not have obtained separate counsel for itself at the start, had it known that Home was going to disclaim coverage for the $5 million excess about $250,000.[5]

Undoubtedly, there are many instances in which an indemnity carrier will wish to reserve its right to disclaim until the predicate litigation has been disposed of. Many different claims may be asserted against an insured and, until an action is over and the basis for liability established, the indemnity carrier will not be able to assess its coverage. This is not such a case, however. Home contends that it was crystal clear from the start that it had provided no coverage for the types of claims asserted against Whiting. The action never did result in a determination of the basis for the insured's liability but, rather, ended in a general settlement. In such a circumstance, an argument clearly can be made that prejudice to the insured resulted from the insurer's unwarranted inaction and subsequent mistaken reliance on an inapplicable portion of the policy. Whether Whiting will ultimately be able to prove reliance and prejudice is another matter, but it is surely entitled to its day in court on those issues.

Consequently, the motion to dismiss is granted as to the third and fifth causes of action (concerning waiver), but denied as to the second and fourth causes of action (concerning estoppel).

SO ORDERED.

---

**5.** Whiting did retain counsel in 1978 when the other carriers sought to assert reservations of right with respect to the direct action brought against it. This counsel, however, did not participate in the first three years of the original suit and, we are told, necessarily deferred to insurance company counsel even after joining the defense. (Settlement negotiations were already in progress at that time, and the action settled a year later.)