INTERNATIONAL INSURANCE COMPANY, Plaintiff-Appellee, v. SARGENT AND LUNDY, Defendant-Appellant.

First District (5th Division)   No. 1—90—2222

Opinion filed January 22, 1993.

William Goldberg, Robert Neiman, and Aaron Horowitz, all of Holleb & Coff, and William J. Harte, of William J. Harte, Ltd., both of Chicago, for appellant.

Edward Ruberry, Jeffrey Goldwater, Bryan Schumann, and Anthony Madormo, all of Bollinger, Ruberry & Garvey, of Chicago, for appellee.

PRESIDING JUSTICE GORDON delivered the opinion of the court.

This appeal involves a dispute between International Insurance Co. (International) and Sargent & Lundy (S&L) arising out of the settlement of an underlying case regarding the design and construction of the Zimmer Nuclear Power Station in Cincinnati, Ohio. The trial court denied S&L's motion to strike two counts of International's complaint which sought rescission and restitution of monies paid by International as part of the settlement. The court also granted International's motion to strike 9 of S&L's 10 affirmative defenses to those counts. We granted S&L's application for leave to appeal, pursuant to Supreme Court Rule 308. (134 Ill. 2d R. 308.) For the reasons set forth below, we reverse and remand.

FACTS

S&L is a partnership which provides architectural and consulting engineering services to public utilities in connection with the design and construction of power plants. In July 1982, S&L submitted applications for insurance to Gibraltar Casualty Company and International. In its applications, S&L represented that it was unaware of "any circumstance occurrence or condition resulting in accident or injury to person or persons, damage to property including loss of use thereof, any unresolved job controversy or complaint *** which may result in the making or assertion of a claim" against it. In November 1982, International issued to S&L an excess insurance policy, providing coverage in the amount of $45 million. The policy period was from July 1, 1982, through July 1, 1983, and was extended by endorsement to July 1, 1984. Primary coverage, in the amount of $5 million, was

provided by Gibraltar Casualty Company. Gibraltar is not a party to this appeal.

Prior to the inception of the primary and excess policies, S&L had entered into a contract with three Ohio utility companies (hereinafter referred to as the CCD companies) to provide architectural and engineering services associated with the construction of the William H. Zimmer Nuclear Power Station in Moscow, Ohio. The CCD companies subsequently filed an action (hereinafter referred to as the Zimmer action) for breach of contract against S&L in connection with S&L's work on the Zimmer project. The CCD companies sought approximately $400 million in damages from S&L in the Zimmer action. S&L filed a counterclaim against the CCD companies, seeking $12,681,110.28 for unpaid fees and professional services rendered to the CCD companies.

On November 2, 1987, a handwritten settlement agreement was drafted for the purpose of settling the Zimmer action. Under the terms of the agreement, Gibraltar was to pay $4,714,182 and International was to pay $22,966,928 to the CCD companies. Contemporaneously, the CCD companies were to pay $12,681,110.28 to S&L on S&L's counterclaim, and S&L was to waive its claim to $6.5 million in interest. The CCD companies and S&L were then to dismiss with prejudice the Zimmer action. By its terms, the agreement was to become effective upon its signature by all parties.

While S&L, Gibraltar and the CCD companies signed the November 2 agreement, International refused to do so. International did, however, enter into an agreement with S&L on November 11, 1987, for the settlement of the Zimmer action. In the November 11 agreement, International agreed to pay to the CCD companies $10,285,818. S&L agreed to pay $12,681,110.28 to the CCD companies and to waive its claim to $6.5 million in interest. The agreement also provided that "SARGENT & LUNDY and INTERNATIONAL INSURANCE COMPANY reserve the right to file an action for the sole purpose of determining S&L's right to reimbursement of the [$12,681,110.28]" which S&L had agreed to pay to the CCD companies. S&L and International "agree[d] to make no other claim other than for a determination of S&L's right to reimbursement of [$12,681,110.28]."

On November 12, 1987, International filed a complaint against S&L seeking a declaration of its duty to reimburse S&L for the $12.7 million which S&L had paid to the CCD companies under the November 11 agreement. In this complaint International contended that the $12.7 million was not within the scope of coverage provided by its pol-

icy and, as a result, it had no duty to reimburse S&L for its payment to the CCD companies. S&L filed an answer and a counterclaim to International's complaint.

On December 5, 1988, International brought another action against S&L, hereinafter referred to as the Kentucky Utilities litigation. In that action, International contested its obligation to indemnify S&L in an underlying suit brought against it by Kentucky Utilities. The underlying suit, filed in 1984, stemmed from a 1976 project in which Kentucky Utilities had retained S&L to do engineering, design and management work on a power station owned by Kentucky Utilities. In the underlying suit, Kentucky Utilities sought damages of over $5.9 million.

In its December 5, 1988, complaint, International alleged that problems with the station arose in 1981, and that S&L was requested by Kentucky Utilities in 1981 to investigate the cause of the problems. The complaint further alleged that S&L had notice of these problems and of potential claims against it as a result of these problems prior to 1982 when it applied for insurance to International, but failed to disclose those potential claims in its application. According to International's complaint, S&L first gave International notice of the underlying Kentucky Utilities suit on September 4, 1984.

According to its brief filed in this appeal, before July 1982 when it applied for insurance with International, S&L had determined that the "bottom line" cause of the damage to the Kentucky Utilities power plant was S&L's own design errors, but S&L failed to disclose this to International in its 1982 application. In addition, S&L made false statements to Kentucky Utilities in an effort to conceal its own responsibility and to mislead Kentucky Utilities to bring suit against three other contractors involved in the project. In early 1988, S&L's codefendants in the underlying Kentucky Utilities suit filed cross-claims against S&L, charging it with injurious falsehood for these alleged misrepresentations. On December 19, 1988, a jury awarded the codefendants $500,000 on their claims. The judgment was reversed on appeal, however, the court holding that S&L's statements were absolutely privileged as communications made preliminary to seriously considered judicial proceedings. *General Electric Co. v. Sargent & Lundy* (6th Cir. 1990), 916 F.2d 1119.[1]

---

[1]On remand, the trial court granted summary judgment in favor of Sargent & Lundy.

In count I of its Kentucky Utilities complaint, International sought rescission of its insurance policy with S&L, based upon S&L's failure to disclose the knowledge it had of the problems with the Kentucky plant when it applied for the policy in 1982. Counts II through V related to coverage issues regarding the underlying Kentucky Utilities suit. In count VI, however, International sought restitution of the $10.3 million it had paid in the Zimmer settlement.

Also on December 5, 1988, Gibraltar filed an action against S&L, in which Gibraltar alleged that its policy limits had been exhausted and sought a declaration that it was not liable for any claims in the underlying Kentucky Utilities action. This action was consolidated with the December 5, 1988, Kentucky Utilities action filed by International.

A settlement was reached on December 6, 1988, in the underlying Kentucky Utilities suit between Kentucky Utilities and S&L, but was stayed pending the outcome of the coverage litigation between S&L and its insurers. S&L's insurers refused to participate in that settlement. S&L, International and Gibraltar subsequently entered into a separate agreement in which each reserved its right to adjudicate the issue of coverage for S&L's settlement with Kentucky Utilities. Pursuant to the settlement agreement, International dismissed the count for restitution of the $10.3 million paid in the Zimmer settlement from its complaint in the Kentucky Utilities litigation, apparently in an effort to expedite the ultimate resolution of the Kentucky Utilities coverage dispute.

On August 17, 1989, International filed a motion to consolidate the previously consolidated Kentucky Utilities actions with the Zimmer action.

On August 27, 1989, International filed an amended complaint in the Zimmer action, adding two new claims. Count VIII sought rescission of the insurance policy with S&L, based upon allegations that prior to its execution of the 1982 insurance application, S&L was aware of "at least one circumstance" which could result in a claim against S&L, without designating whether that circumstance involved the Kentucky Utilities liability. International alleged that S&L's failure to disclose any such circumstances in its application constituted a material misrepresentation which entitled it (International) to rescind the policy. In count IX, International sought restitution of the approximately $10.3 million it had paid to the CCD companies in conjunction with the Zimmer settlement. Essentially, this was the same restitution count previously dismissed by International in the Kentucky Utilities action. It is only these new counts which are the subject of this ap-

peal; the other counts remain pending in the trial court. Attached as exhibits to the amended complaint were copies of the insurance policy, S&L's application for the policy, and a copy of the November 11 agreement.

S&L moved to dismiss counts VIII and IX of the amended complaint pursuant to section 2—615 of the Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—615.) The grounds asserted were that the November 11 agreement prevented International from raising any claim concerning the Zimmer action other than the one explicitly reserved: a determination of International's obligation to reimburse S&L for the $12.7 million which S&L had paid to the CCD companies. According to S&L, since International did not challenge the validity of the November 11 agreement with respect to the $10.3 million, it was barred from bringing a claim for rescission and restitution. S&L also urged that to grant rescission of the November 11 agreement, it would be necessary to restore the parties to the status quo *ante* prior to the November 11 agreement, and that since International had not joined either Gibraltar or the CCD companies as parties, such restoration would be impossible.

On October 5, 1989, S&L's motion to dismiss was denied. In so doing, the trial court stated "you cannot waive what you don't know." In addition, although S&L's motion was denominated as a section 2—615 motion and was based entirely on the complaint with its attached exhibits, the court stated that the motion should have been brought under section 2—619. (Ill. Rev. Stat. 1989, ch. 110, par. 2—619.) The October 5, 1989, order denying the motion states "The Court having considered Sargent & Lundy's Motion to Dismiss both under Section 2—615 and Section 2—619 of the Illinois Code of Civil Procedure, Sargent & Lundy's Motion to Dismiss is denied with prejudice both as to Section 2—615 and Section 2—619."

Also on October 5, 1989, the court granted International's motion of August 17, 1989, to consolidate the Zimmer action with the previously consolidated Kentucky Utilities actions.

S&L then filed its answer to the amended complaint and 10 affirmative defenses to the rescission and restitution counts. After the original affirmative defenses were dismissed for lack of specificity, S&L filed amended affirmative defenses. The first amended defense was based upon International's alleged failure to comply with provisions of the Illinois Insurance Code. (Ill. Rev. Stat. 1989, ch. 73, par. 613 *et seq.*) The second through fifth affirmative defenses asserted that International was estopped by its conduct from bringing these counts. Affirmative defense six asserted that International's claim

was barred by *laches*. In affirmative defense number seven, S&L alleged that International could not pursue the rescission claim because it was based upon information which International knew prior to signing the November 11 agreement. Affirmative defense eight contended that rescission and restoration were not available because International was unable to restore the status quo *ante*. Affirmative defense number nine alleged that International had not acted with due diligence, and number 10 accused International of being guilty of unclean hands.

International filed a section 2—615 motion to dismiss S&L's amended affirmative defenses. Following briefing and a hearing, the trial court struck with prejudice affirmative defenses 2 through 10.

S&L then moved the trial court for a finding, pursuant to Illinois Supreme Court Rule 308 (134 Ill. 2d R. 308), that the order denying S&L's motion to dismiss the rescission and restitution counts of International's amended complaint and the order granting International's motion to dismiss S&L's amended affirmative defenses 2 through 10 involved questions of law as to which there are substantial grounds for differences of opinion and that an immediate appeal from those orders may materially advance the ultimate termination of the litigation. On July 24, 1990, the trial court granted S&L's motion, and certified three questions for appeal:

> "a. Whether the terms of the November 11, 1987 agreement between Sargent & Lundy and International bar International's recission [*sic*] and restitution claims;
>
> b. Whether the Court must return the parties to the *status quo ante* and require International to return the benefits it obtained by a change in the *status quo* before granting recission [*sic*]; and
>
> c. Whether any of Sargent & Lundy's Affirmative Defenses 2 through 10 allege facts which, if proven, would defeat International's recission [*sic*] and restitution claims in whole or in part."

Also on July 24, 1990, International filed a second amended complaint in the now consolidated action. The second amended complaint added a count involving claims made against S&L in a lawsuit by Wabash Valley Power Association (the Wabash Valley litigation) in connection with work S&L had done on a power plant in Indiana. In this new count, International sought a declaration that it had no obligation to indemnify S&L for any monies in the Wabash Valley litigation.

This court granted S&L's application for leave to appeal pursuant to Rule 308(a).

OPINION

■■ Before addressing the certified questions, it is necessary to comment on the trial court's consideration of S&L's motion to dismiss counts VIII and IX under both section 2—615 and section 2—619 of the Code of Civil Procedure. Although it is not entirely clear from the record why the court felt that the motion should have been brought under section 2—619 rather than section 2—615, apparently the court considered the November 11 agreement relied upon by S&L as "other affirmative matter avoiding the legal effect of or defeating the claim." (Ill. Rev. Stat. 1989, ch. 110, par. 2—619(a)(9).) That agreement was attached as an exhibit to International's amended complaint. As a result, it is considered to be part of the pleading and facts stated in the exhibit are considered as having been alleged in the complaint. (Ill. Rev. Stat. 1989, ch. 110, par. 2—606 ("the exhibit constitutes a part of the pleading for all purposes"); *Ford v. University of Illinois Board of Trustees* (1977), 55 Ill. App. 3d 744, 371 N.E.2d 173.) Furthermore, matters contained in such exhibits which conflict with allegations of the complaint negate any contrary allegations of the complaint. (*Ford v. University of Illinois Board of Trustees*, 55 Ill. App. 3d 744, 371 N.E.2d 173.) The record does not reflect any additional submissions by either party, whether by affidavit or otherwise, in support of or in opposition to the motion. Consequently, we shall consider the motion as one brought under section 2—615 for which we may look only to the sufficiency of the pleadings.

Proceeding to the merits, the first question is whether the terms of the November 11 agreement between S&L and International bar International's rescission and restitution claims as pleaded. As discussed below, we conclude that it does.

■■ Where no ambiguity is present in an agreement, the intention of the parties must be ascertained from the words of the agreement and the circumstances of its execution. (*Chubb v. Amax Coal Co.* (1984), 125 Ill. App. 3d 682, 686, 466 N.E.2d 369; see also *Touhy v. Twentieth Century-Fox Film Corp.* (1979), 69 Ill. App. 3d 508, 387 N.E.2d 862.) A release is a contract whereby a party abandons a claim to the person against whom the claim exists. (*Touhy v. Twentieth Century-Fox Film Corp.*, 69 Ill. App. 3d 508.) As a contract, the interpretation of a release is governed by contract law. (*Farm Credit Bank v. Whitlock* (1991), 144 Ill. 2d 440, 447, 581 N.E.2d 664.) The rights of the parties are limited to the terms expressed in the agreement. (*Murphy v. S-M Delaware, Inc.* (1981), 95 Ill. App. 3d 562, 565, 420 N.E.2d 456.) A release will not be construed to release claims not

within the contemplation of the parties. (*Carona v. Illinois Central Gulf R.R. Co.* (1990), 203 Ill. App. 3d 947, 951, 561 N.E.2d 239.) Where a release is clear and explicit, the court must enforce it as written. (*Continental Illinois National Bank & Trust Co. v. Sax* (1990), 199 Ill. App. 3d 685, 693, 557 N.E.2d 475.) The issue of whether a release is ambiguous is a matter of law. (*Murphy v. S-M Delaware, Inc.*, 95 Ill. App. 3d 562, 420 N.E.2d 456.) Accordingly, we look to November 11 agreement to determine whether it bars the claims brought here.

There is no ambiguity in the November 11 agreement. The "whereas" portion of the agreement makes it clear that the purpose of the agreement is the settlement of the Zimmer litigation, with the reservation of the right to challenge only the $12.7 million to be paid by S&L. The operative portion of the agreement then sets out the payments to be made to the CCD companies by International and S&L. International is to pay approximately $10.3 million, and S&L is to pay approximately $12.7 million. The agreement provides that International and S&L "reserve the right to file an action for the sole purpose of determining S&L's right to reimbursement of the [$12.7 million]" referred to above. The agreement also states that S&L and International "agree to make no other claim other than for a determination of S&L's right to reimbursement of [$12.7 million]."

These provisions of the November 11 agreement are clear and apparent. The parties are each to make a payment to the CCD companies in settlement of the Zimmer action. S&L is to pay $12.7 million and International is to pay $10.3 million. It is clear from the context of these provisions that the parties acknowledge two possible claims: one for S&L's right to seek reimbursement of the $12.7 million it paid and the other for International's right to seek reimbursement of the $10.3 million it paid. With respect to those possible claims, the agreement explicitly reserves the rights of the parties only with respect to the former and not with respect to the latter.

■ International contends, however, that since the agreement does not in any way limit the defenses it may raise in response to a claim by S&L for reimbursement of the $12.7 million which S&L paid, and it could assert its right to rescission of the policy in defense of such an action, it therefore is not barred from asserting that same right to recover the $10.3 million which it paid in the Zimmer settlement. While International is correct that the agreement does not make any reference to the theories available to defend against the explicitly reserved claim by S&L for reimbursement of the $12.7 million, the agreement also fails to set forth any theories which are reserved

to International that it might use in a claim for reimbursement of the $10.3 million. There is no language in the agreement limiting International's release of a claim for the $10.3 million to those claims arising under any specific theories of law. (See *Murphy v. S-M Delaware, Inc.*, 95 Ill. App. 3d at 566 (court holds that in the absence of "language limiting the provisions of the release to those claims, demands, or cause of action which arise solely from ownership of stock," and in light of specific reservation of claims for compensation accruing within 30 days of release date, release must be interpreted to cover claim for sales commissions accruing more than 30 days prior).) In this sense, the release is absolute. Regardless of the theory used, the claim International seeks to assert here remains a claim for reimbursement of the $10.3 million it paid. As discussed above, the language of the agreement bars any such claim by International irrespective of the theory under which such claim is brought.

International next contends, however, that, even if purportedly waived under the express language of the agreement, its rescission and restitution claims were not in the contemplation of the parties when they signed the agreement. International argues that it could not have released or waived its right to bring these claims of rescission and restitution because it was unaware of any such right when it entered into the November 11 agreement due to the fact that the right did not even exist at that time.

We agree with International that a release cannot be construed to include claims which were not within the contemplation of the parties. (*Carona v. Illinois Central Gulf R.R. Co.* (1990), 203 Ill. App. 3d 947, 951, 561 N.E.2d 239; *Chubb v. Amax Coal Co.* (1984), 125 Ill. App. 3d 682, 466 N.E.2d 369; *Murphy v. S-M Delaware, Inc.* (1981), 95 Ill. App. 3d 562, 420 N.E.2d 456.) "[A] release, no matter how broad its terms, will not be construed to include claims not within the contemplation of the parties." (*Chubb v. Amax Coal Co.*, 125 Ill. App. 3d at 686.) A release will not be held to apply to an unspecified claim if the releasing party is unaware of such claim when executing the release. (*Myers v. Health Specialists, S.C.* (1992), 225 Ill. App. 3d 68, 74, 587 N.E.2d 494, citing *Farm Credit Bank v. Whitlock*, 144 Ill. 2d at 447-48.) A general release will be held to apply only to claims in existence at the time the release is executed and "claims that originate subsequent to its execution are not discharged absent a clear expression of intent to that effect." (*Chubb v. Amax Coal Co.*, 125 Ill. App. 3d at 686.) However, the fact that a release does not specifically mention a particular type of action or that a claim is not yet in existence when a release is executed does not necessarily mean that that type of action

is not released. (See *Rakowski v. Lucente* (1984), 104 Ill. 2d 317, 323, 472 N.E.2d 791 (fact that action in which Lucente asserted counterclaim against Rakowski had not yet been filed when Lucente executed release in favor of Rakowski did not preclude finding that counterclaim was barred by release; court finds "no basis for Lucente's argument that the release did not include a specific type of action, that is, his right against Rakowski for contribution, because that action was not expressly enumerated"); *Continental National Bank & Trust Co. v. Sax* (1990), 199 Ill. App. 3d 685, 557 N.E.2d 475 (fact that no mismanagement claims had yet been filed and fact that settlement order did not specifically include trustee mismanagement claims did not exclude such claims from release under agreed settlement order).) In a broadly worded release, an attempt to list the specific types of actions covered would detract from the general scope of its release. *Rakowski v. Lucente*, 104 Ill. 2d 317, 472 N.E.2d 791; *Continental National Bank & Trust Co. v. Sax*, 199 Ill. App. 3d 685, 557 N.E.2d 475.

Here, International argues that this claim for rescission and restitution of the $10.3 million was not within the contemplation of the parties because the right did not come into existence until after the November 11 agreement. Although the alleged misrepresentations occurred in 1982, long before the Zimmer agreement was entered into, apparently International's contention that its right to rescission did not exist until after the Zimmer agreement is that it did not become aware of those misrepresentations until after November 11, 1987. However, the fact that the right to rescission had not ripened is not dispositive. *Rakowski v. Lucente*, 104 Ill. 2d 317, 472 N.E.2d 791; *Continental Illinois National Bank & Trust Co. v. Sax*, 199 Ill. App. 3d 685, 557 N.E.2d 475.

Although International makes the argument that it could not have released this claim because it was unaware of its right to rescission and restitution on November 11, the complaint contains no allegations of this purported ignorance. Nor are there any allegations as to when International first became aware of its right or the alleged misrepresentations. The record is also devoid of any section 2—619 submissions by way of affidavit or other testimony which would indicate that International was without knowledge of its right to rescind when it entered into the November 11 agreement. Without such allegations, and considering the broad scope of the agreement, we cannot say that the parties did not intend to preclude the action for rescission and restitution which International seeks to assert here.

The case of *Ainsworth Corp. v. Cenco, Inc.* (1982), 107 Ill. App. 3d 435, 437 N.E.2d 817, *appeal after remand* (1987), 158 Ill. App. 3d

639, 511 N.E.2d 1149, is on point. In *Ainsworth*, plaintiff buyers and defendant sellers entered into an asset purchase agreement whereby plaintiffs agreed to purchase, among other assets, all inventory of a company owned by defendants. A portion of that agreement entitled "Representations and Warranties of Sellers" stated that defendants' manufacturing processes and sterility procedures complied with all State and Federal safety laws, including those of the United States Food and Drug Administration.

Several months after the purchase, a dispute arose regarding inventory assets. The parties subsequently entered into a settlement agreement "to resolve the existing dispute." The settlement agreement, in reference to the representations made by defendants in the asset purchase agreement, stated that plaintiffs "waive[d] any breach of any such representations, warranties or covenants, or any default under the agreement which may have occurred prior to the date of this agreement." 107 Ill. App. 3d at 437.

Four months later, an investigation by the United States Food and Drug Administration (FDA) revealed that certain of plaintiffs' processes and sterility procedures were in violation of FDA regulations. Plaintiffs filed suit for injunctive relief and monetary damages, alleging that defendants had fraudulently induced them to enter into the asset purchase agreement by their misrepresentation regarding compliance with Federal regulations. Defendants raised the settlement as an affirmative defense, contending that plaintiffs had waived their right to bring an action based upon the warranties and representations made in the asset purchase agreement. The trial court granted defendants' motion for summary judgment.

The appellate court reversed, finding that summary judgment was not warranted because genuine issues of material fact remained. The court stated, "It is true that one may waive a defense of fraud by entering into a new contract; however, *knowledge of the fraud at the time of signing the [second contract] is a prerequisite to such waiver.*" (Emphasis in original.) (*Ainsworth Corp. v. Cenco, Inc.*, 107 Ill. App. 3d at 440.) The question of "whether or not fraud has been waived is generally a question of fact" as is "the significance of silence or inaction after discovery of fraud." *Ainsworth Corp. v. Cenco, Inc.*, 107 Ill. App. 3d at 440.

Here, the question of International's knowledge in 1987 of the alleged misrepresentations made by S&L in 1982 is key to determining whether this claim was released by the November 11 agreement. International, in its brief before this court, contends that it did not become aware of the alleged misrepresentations until some time in

1988. However, as this matter is before us on review of the trial court's denial of a section 2—615 motion to dismiss, our consideration is limited to the facts alleged in the complaint. As noted above, there are no allegations in the complaint of any lack of knowledge. If, in fact, International is correct in its contention that it was unaware of its right to rescission when it signed the November 11 agreement, that fact should have been pleaded. Without such factual allegations in the complaint, and considering the clear language of the agreement, the pleadings are insufficient to avoid the preclusive effect of the November 11 agreement.

We also reject International's contention that a finding that its claim for rescission and restitution of the $10.3 million it paid in the Zimmer settlement is barred by the November 11 agreement would mean that an insurer must rescind an insurance policy claim by claim. International's argument is based upon S&L's "admission" that the November 11 Zimmer agreement relates only to the Zimmer claim and has no effect on International's right to rescind its policy as to any or all other claims under the policy. However, the fact that the policy becomes rescindable with respect to these other claims does not revoke the agreement with respect to the Zimmer claim in which the insurer gave up the right to challenge its insured's claim for the amount of $10.3 million whether by rescission or otherwise. Conversely, although International may be barred from asserting rescission of the policy as a basis for its claim of restitution of the $10.3 million it paid in the Zimmer settlement because of the November 11 agreement, this has no effect on its rights in other cases such as the Kentucky Utilities or Wabash Valley actions. See *Chubb v. Amax Coal Co.* (1984), 125 Ill. App. 3d 682, 684, 466 N.E.2d 369 (release of "all claims *** or causes of action in any way connected with or arising out of [employer's long-term disability policy]" did not bar subsequent claim under same policy which arose after the date of the release and after employee returned to work for employer).

The parties have argued, and we have considered, the effect of the November 11 settlement agreement under the tacit assumption that it is a release. A release is an agreement which extinguishes a cause of action. (*Brady v. Prairie Material Sales, Inc.* (1989), 190 Ill. App. 3d 571, 575, 546 N.E.2d 802; *Ledesma v. Cannonball, Inc.* (1989), 182 Ill. App. 3d 718, 724, 538 N.E.2d 655.) We note, however, that nowhere in the agreement is the word "release" found. Instead, it speaks of the "reservation" of certain rights and the "agreement" of the parties not to make other claims. Thus, the November 11 agreement might be more accurately considered a covenant not to sue

rather than a release. (Compare *Ledesma v. Cannonball, Inc.*, 182 Ill. App. 3d 718, 538 N.E.2d 655 (although instrument entitled "release" and included language that "release" was "full and final satisfaction" of plaintiff's claim, typed-in language expressly reserving rights against defendant held to be dispositive of intent that the agreement was a covenant not to sue rather than a release), with *Brady v. Prairie Material Sales, Inc.*, 190 Ill. App. 3d 571, 546 N.E.2d 802 (instrument which includes term "release" and not "covenant" held to be a release rather than a covenant not to sue).) As a covenant not to sue, it would "affect[ ] only the right to bring suit and not the underlying cause of action itself." (*Brady v. Prairie Material Sales, Inc.*, 190 Ill. App. 3d at 575; *Ledesma v. Cannonball, Inc.*, 182 Ill. App. 3d at 724.) However, whether the agreement is considered to be a release or a covenant not to sue, the issue in either case is the intent of the parties to the agreement. *Brady v. Prairie Material Sales, Inc.*, 190 Ill. App. 3d at 575 ("framing the issue as whether an instrument is a release or a covenant not to sue * * * distorts the real issue, which is a determination of the intent of the parties to the agreement"); *Pate v. City of Sesser* (1979), 75 Ill. App. 3d 233, 239, 393 N.E.2d 1146 ("[r]ather than assigning a legal label to the instrument, we should instead focus upon and give effect to the intent of the parties").

Accordingly, for all the above reasons, we hold that the November 11 agreement bars International's assertion of counts VIII and IX for rescission and restitution of the $10.3 million it paid in connection with the Zimmer settlement as pleaded. We therefore answer the first certified question in the affirmative.

■ The second certified question for our consideration, as framed by the trial court, is "whether the Court must return the parties to the *status quo ante* and require International to return the benefits it obtained by a change in the *status quo* before granting recission [*sic*]." There is no dispute, however, between the parties as to whether the remedy of rescission requires that the parties be returned to the status quo *ante*. "[I]nherent in the remedy of rescission is the return of the parties to their proper precontract positions. Rescission is an equitable doctrine, and a party seeking rescission must restore the other party to the status quo existing at the time the contract was made." (*Puskar v. Hughes* (1989), 179 Ill. App. 3d 522, 528, 533 N.E.2d 962.) What is in dispute is precisely what International would be required to restore to S&L in order to obtain rescission here.

S&L argues that International must return the benefits it received by the Zimmer settlement. These benefits, S&L contends, include capping its potential loss at $23 million, when its policy limit was $45 mil-

lion. In addition, S&L contends that International avoided the risk that, if there had been no settlement and S&L had lost at trial, International could have been liable for amounts in excess of its policy limits for bad-faith refusal to settle. S&L argues that since it is impossible for International to restore these benefits without undoing the Zimmer settlement, rescission is not available here.

International's argument, that it need only return to S&L the premiums S&L paid under the insurance policy, is based upon its position that it is seeking only to rescind the policy and that it is not necessary to undo the November 11 agreement or the underlying Zimmer settlement between S&L, the CCD companies and Gibraltar Casualty. Moreover, International contends, the "benefits" which S&L claims International must restore are illusory, since without a valid policy in effect, capping of loss and potential liability for refusal to settle are meaningless. In addition, International urges that even if these "benefits" must be restored, its inability to do so does not bar rescission when such restoration is impossible.

As noted above, rescission of a contract generally requires that the parties be placed in their positions existing when the contract was made (*Puskar v. Hughes*, 179 Ill. App. 3d 522, 533 N.E.2d 962; *Luciani v. Bestor* (1982), 106 Ill. App. 3d 878, 882, 436 N.E.2d 251 ("[a]s a general rule, a court sitting in equity will not decree rescission of a contract where the parties cannot be placed in the *status quo ante*"); *Hakala v. Illinois Dodge City Corp.* (1978), 64 Ill. App. 3d 114, 120, 380 N.E.2d 1177 ("it is a general principle of the doctrine of rescission that a person demanding rescission restore the other party to the status quo existing at the time the contract was made").) Where such restoration is impossible, however, it does not necessarily preclude granting of rescission. Restoration of the status quo *ante* will not be required when restoration has been rendered impossible by circumstances not the fault of the party seeking rescission, and the party opposing the rescission has obtained a benefit from the contract. (*John Burns Construction Co. v. Interlake, Inc.* (1982), 105 Ill. App. 3d 19, 27, 433 N.E.2d 1126 ("Where, as here, however, a party has received a benefit and restoration of the status quo has been rendered impossible by reason of circumstances not the fault of the party seeking to rescind, restoration or an offer to restore need not be made"); see also *Hakala v. Illinois Dodge City Corp.*, 64 Ill. App. 3d at 120 (the party seeking rescission "is not required to put the other party in the same situation in which he was before the contract, where the latter has rendered it impossible by the nature of his fraud or other act, or where from the nature of the land and the purpose for which it was purchased, it is impossible to restore the status quo").) Rescission

will not be granted, however, where the actions of the party seeking rescission have "created an impediment" to the court's ability to restore the status quo *ante*. *Klucznik v. Nikitopoulos* (1987), 152 Ill. App. 3d 323, 328, 503 N.E.2d 1147.

■ In the instant case, it is impossible to place International in the position it was prior to the Zimmer settlement. Without undoing both the November 11 and the November 2 agreements and reinstating the underlying Zimmer action, there is simply no way that International can be exposed to the same risks it eliminated by settling. This impossibility, however, is not attributable to International. (*Cf. Klucznik v. Nikitopoulos*, 152 Ill. App. 3d at 328 (plaintiffs "unnecessarily complicat[ed]" rescission by continued occupation of defendant's premises for several months after they became aware of grounds asserted for rescission); *Luciani v. Bestor*, 106 Ill. App. 3d 878, 436 N.E.2d 251 (rescission denied where plaintiff's continued operation of defendant's business after learning of grounds for rescission but before bringing claim made restoration of status quo *ante* impossible).) In addition, S&L apparently derived substantial benefit from the Zimmer settlement in its own right. The CCD companies had sought approximately $400 million in damages, an amount considerably in excess of the coverage provided in S&L's policies with Gibraltar and International. Thus, by settling, S&L capped its liability as well as that of International and eliminated the significant additional risk that it was exposed to had the case gone to trial. Moreover, although S&L paid $12.7 million to the CCD companies in the settlement, it also received from the CCD companies $12.7 million on its counterclaim for unpaid fees and professional services. Consequently, International's rescission claim, if properly pleaded, would not necessarily be barred on the grounds of any inability to restore the status quo *ante* at this stage of the proceedings.

Finally, although we have determined above that the November 11 agreement bars International's rescission and restitution claim as pleaded, we briefly address the dismissal of S&L's affirmative defenses which are the subject of the third certified question. We do so because of the possibility that on remand the counts at issue may be repleaded.

■ The facts establishing an affirmative defense must be pleaded with the same degree of specificity required by a plaintiff to establish a cause of action. (*Kermeen v. City of Peoria* (1978), 65 Ill. App. 3d 969, 973, 382 N.E.2d 1374 ("facts constituting an affirmative defense must be plainly set forth in the answer").) A motion to dismiss an affirmative defense pursuant to section 2—615, as with all section 2—615 motions, admits all well-pleaded facts constituting the defense and attacks only the legal sufficiency of those facts. (*Raprager v. Allstate Insurance Co.*

(1989), 183 Ill. App. 3d 847, 854, 539 N.E.2d 787.) Where the well-pleaded facts of an affirmative defense raise the possibility that the party asserting them will prevail, the defense should not be stricken. *Raprager v. Allstate*, 183 Ill. App. 3d 847, 539 N.E.2d 787; *Farmer City State Bank v. Guingrich* (1985), 139 Ill. App. 3d 416, 487 N.E.2d 758.

In affirmative defense number two, S&L alleges that International is estopped from asserting its rescission and restitution claims "by reason of its promise to insure Sargent & Lundy according to the terms of its policy." S&L alleges that, in reliance on International's promise, it "did not obtain other insurance and proceeded to defend and settle litigation against it, including the *Zimmer* case." S&L further alleges that International was aware of the circumstances of the Kentucky Utilities and Wabash Valley claims in 1984, three years prior to the Zimmer settlement. S&L also alleges that it relied, to its detriment, on International's conduct in settling the Zimmer litigation and on International's promise that it would not seek to recover the $10.3 million it paid pursuant to the settlement.

International asserts that an estoppel may not be based solely on an insured's reliance on a belief that it has insurance coverage. (See *Old Mutual Casualty Co. v. Clark* (1977), 53 Ill. App. 3d 274, 279, 368 N.E.2d 702 ("an estoppel may not be predicated on the mere fact that the [defendants] 'were lulled into a belief' that plaintiff would conduct all investigations and 'defend all the litigation, pending and threatened' ").) The affirmative defense asserted here, however, goes beyond a mere reliance on a belief of coverage. As discussed above, when International became aware of the facts underlying its rescission claim is a pivotal question in this matter. S&L alleges International never questioned the validity of the policy while it participated in the Zimmer settlement although it was aware of its right to rescind at the time. Such conduct could conceivably form the basis of an estoppel, and as a result, dismissal of this defense was in error. See *National Ben Franklin Insurance Co. v. Davidovich* (1984), 123 Ill. App. 3d 88, 462 N.E.2d 696 (wherein the court found insurer estopped from denying coverage by retroactive reformation of policy because insurer had led insured to rely on the existence of coverage for over two years in resolving claim against insured).

S&L's third affirmative defense alleged estoppel by reason of International's conduct in entering into the November 11 agreement and performing that agreement by paying the $10.3 million to the CCD companies. In this defense, S&L incorporated certain paragraphs of its counterclaim against International, wherein were set forth in some de-

tail the events in the Zimmer litigation leading up to the November 11 agreement. As discussed above in regard to the previous affirmative defense, an estoppel could arise from such conduct. (*National Ben Franklin Insurance Co. v. Davidovich*, 123 Ill. App. 3d 88, 462 N.E.2d 696.) Although we have concluded earlier that under the pleadings in their current state the inability of International to restore the status quo existing prior to the Zimmer settlement would not prevent International from seeking rescission based on the factors discussed above, the possibility still remains that International could be estopped from doing so. If it can be shown that S&L relied to its detriment on International's conduct during the Zimmer action or in settling the matter, an estoppel would arise whereby International would be precluded from asserting its right. See *Wald v. Chicago Shippers Association* (1988), 175 Ill. App. 3d 607, 622, 529 N.E.2d 1138 ("estoppel arises through a party's voluntary conduct whereby he is precluded from asserting his rights against another who in good faith relied on such conduct and was therefore led to change his position to his detriment").

The fourth affirmative defense also alleges estoppel, in this instance arising from International's failure to issue any reservation of rights letter in the Zimmer litigation. Included in this affirmative defense is a portion of a letter dated June 9, 1987, from International's counsel to International, which stated, in part, "An excess carrier's failure to reserve its right in a timely fashion will estop it from denying coverage where the rights of the insured have been prejudiced by the failure. *Whiting v. Home Insurance Company*, 516 F. Supp. 642 (S.D.N.Y. 1981)." Quoting from the deposition of William Murray, International claims adjuster, S&L also alleged that "as a matter of practice, International issues reservation of rights letters as promptly as possible because it is both 'good claim file handling' and 'fair to everybody involved, including the insured.' "

International's response to this affirmative defense is that as an excess insurer, it had no duty to issue such a letter and therefore could not be estopped from asserting its rescission and restitution claims here by a failure to do so. In its brief before this court, International characterizes *Whiting Corp. v. Home Insurance Co.* (S.D.N.Y. 1981), 516 F. Supp. 643 as a "minority of one" which has been "openly criticized by other courts and various commentators," and "the only decision that suggests that estoppel may lie against an excess carrier in a similar situation."

It is true that the majority of cases hold that an excess insurer which has no duty to investigate coverage issues or to defend its insured will not be estopped from later asserting coverage defenses by a failure to issue a reservation of rights letter. (See, *e.g., St. Paul Fire & Marine*

*Insurance Co. v. Children's Hospital National Medical Center* (D.D.C. 1987), 670 F. Supp. 393, 402 ("duty to disclaim coverage or reserve rights is a part of the duty to defend"); *Phoenix Insurance Co. v. United States Fire Insurance Co.* (1987), 189 Cal. App. 3d 1511, 235 Cal. Rptr. 185; but see *Whiting Corp. v. Home Insurance Co.*, 516 F. Supp. 643.) It is the duty to defend which gives rise to the duty to reserve rights when defense of a claim is undertaken, and without such a duty an insurer has no obligation to issue a reservation of rights letter. (*St. Paul Fire & Marine Insurance Co. v. Children's Hospital National Medical Center*, 670 F. Supp. 393.) S&L alleges here, however, that International "as a matter of practice" issued reservation of rights letters. While it may be that such a course of conduct between an insurer and its insured could give rise to an estoppel if detrimentally relied upon by the insured, no allegations have been made of such a course of conduct between the parties here. Only International's general practice is referred to. (*DeGraw v. State Security Insurance Co.* (1976), 40 Ill. App. 3d 26, 34, 351 N.E.2d 302 ("[e]vidence of this kind [custom and usage], if indeed an identifiable custom or business practice *** could be dispositive of *** whether a particular defendant should be estopped to deny liability"); see also *Bauter v. Reding* (1979), 68 Ill. App. 3d 171, 385 N.E.2d 886 (estoppel may be based on course of conduct by insurer in handling claim); *Reynolds v. Guarantee Reserve Life Insurance Co.* (1976), 44 Ill. App. 3d 764, 358 N.E.2d 940.) There are no allegations that S&L had ever received such a letter from International in the past. In addition, there are no allegations that S&L relied on such course of conduct to its detriment. Consequently, the fourth affirmative defense is insufficiently pleaded.

The fifth affirmative defense was simply a combination of defenses two through four. As a result, we do not address it separately.

We note that, in dismissing defenses two through five, the court stated "you haven't shown any misrepresentations or reliance on representations; and therefore, I'm going to strike two, three, four, and five." Estoppel, however, does not require a misrepresentation, but may be based on conduct or nonaction by an insurer upon which the insured relies to his detriment. *Meier v. Aetna Life & Casualty Standard Fire Insurance Co.* (1986), 149 Ill. App. 3d 932, 938, 500 N.E.2d 1096 ("[e]stoppel implies prejudicial reliance by the insured upon some conduct, act or nonaction of the insurer. [Citations.] Estoppel may be found even though the insurer intended neither to mislead, nor to relinquish its own rights"); see generally 16B J. Appleman & J. Appleman, *Insurance Law & Practice* §9081, at 491-96 (1981).

In affirmative defense six, S&L raises the issue of *laches*. S&L alleges that, prior to November 11, 1987, International knew the information upon which it now bases its rescission action, and that International unreasonably delayed bringing its rescission and restitution claims until December 5, 1988. In this defense, S&L relies on the specific allegations of affirmative defense number two as to when International learned of its right to rescission.

*Laches* is "such neglect or omission to assert a right, taken in conjunction with a lapse of time of the more or less duration and other circumstances causing prejudice to an adverse party, as will operate to bar relief in equity." (*Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 552, 147 N.E.2d 341.) Such a failure to assert a right, a lapse of time, and prejudice to S&L have been alleged here.

In dismissing this defense, the trial court stated "[t]here is absolutely no basis for it. I'm taking in the historic background of this case." It appears that the court was making a factual determination regarding when International learned of its right to rescission. As with any section 2—615 motion, however, all well-pleaded facts must be accepted as true. *Raprager v. Allstate Insurance Co.*, 183 Ill. App. 3d 847, 539 N.E.2d 787.

The seventh affirmative defense alleged that the November 11 agreement barred International from bringing its rescission and restitution claims. Here S&L also alleged that International was aware of the information on which it based its rescission claim at the time the November 11 agreement was signed. The court dismissed this defense as well, stating, "As to International's having information that knew prior to the signing of the November 11, 1987, agreement which you contend is a waiver, I'm going to strike that." As with the previous affirmative defense, the court erred in making factual determinations and in not accepting pleaded facts as true.

In striking affirmative defense eight, wherein S&L alleged that International was not entitled to rescission and restitution because it did not seek to undo the Zimmer settlement or to restore all benefits it received in that settlement, the court relied on its earlier determination that it was not necessary to rescind the Zimmer settlement and that the November 11 Zimmer agreement did not bar International's right to rescission and restitution of the $10.3 million. This issue has been previously discussed above.

In the ninth affirmative defense S&L alleged lack of due diligence by International in pursuing its rescission claim after it learned of the facts upon which the claim was based. Again S&L incorporated the specific allegations of its second affirmative defense as to when Interna-

tional learned of its right to rescission. Although it is somewhat unclear how this affirmative defense differs from number six alleging *laches*, in dismissing this defense the court again made an impermissible factual determination, stating "I contend that they found that out at a later date."

The court also struck the tenth affirmative defense alleging unclean hands, but stated that since it would be considering all the evidence, "if I ever find that they are doing something in bad faith or with unclean hands, I will *sua sponte* say that their hands are dirty." No reason was given for this dismissal. Our review of this affirmative defense, however, reveals that its allegations are totally conclusory in nature and are devoid of any specific facts supporting the conclusion that International's conduct "has been unconscionable and tainted with bad faith." As a result, the trial court was correct in striking this defense.

■ Although we have determined that most of S&L's affirmative defenses were prematurely dismissed, we need not reverse the order of dismissal of those defenses. Since we have also concluded that as pleaded the claim for rescission and restitution against which these affirmative defenses are raised is barred by the language of the November 11 agreement, the question of the affirmative defenses is not yet reached at this stage of the pleading. We are also mindful of the fact that if International's counts for rescission and restitution are properly repleaded, some of S&L's affirmative defenses could then more appropriately be raised as denials of those repleaded allegations rather than as new affirmative matter.

In conclusion, we reverse the trial court's order denying S&L's motion to dismiss counts VIII and IX of International's amended complaint, and remand this matter to the trial court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

MURRAY and COUSINS,* JJ., concur.

---

*Prior to his retirement, Justice Lorenz heard the oral argument in this appeal. Following his retirement, Justice Cousins was substituted for Justice Lorenz on the panel of this appeal, and he has listened to the tape of the orals and has read the briefs and record.